SOUTHWICK v. SOUTHWICK.

1. DIVORCE—EXTREME CRUELTY—EVIDENCE.

Testimony tending to show that defendant husband constantly quarreled with his wife, insisting upon controlling all her acts, that he forbade her seeing her former friends, attempted to coerce her to convey to him property which she had, and so conducted himself as to render the marriage relation impossible, sustained a decree of divorce in favor of the wife.

2. HUSBAND AND WIFE—FIDUCIARY RELATION—DEEDS.

When a voluntary conveyance from the wife to her husband is attacked for fraud, the burden is on him to show that the transaction was free on the wife's part.

3. SAME.

And where it appeared that the husband brought continuous pressure to bear on the wife and employed the relations between them to coerce her into deeding to him valuable real estate in order to have peace and escape from unkindness and quarrels, the court was warranted in setting it aside as fraudulent.[1]

---

[1] As to the validity of a direct conveyance by wife to husband, see note in 31 L. R. A. (N. S.) 844.

Appeal from Wayne; Hosmer, J.   Submitted April 25, 1913.   (Docket No. 76.)   Decided May 28, 1913.

Bill by Frank S. Southwick against William D. Southwick for divorce.   Complainant later filed a bill to set aside certain conveyances and the cases were consolidated.   From a decree for complainant, defendant appeals.   Affirmed.

*Clark, Lockwood, Bryant & Klein (Jasper C. Gates,* of counsel), for complainant.

*Sherman D. Callender* and *Arthur H. Covert (Claudius B. Grant,* of counsel), for defendant.

KUHN, J.   On the 30th day of December, A. D. 1910, a bill of complaint was filed by the complainant to obtain a divorce on the grounds of extreme cruelty, and on June 9, 1911, another bill of complaint was filed by the complainant to set aside a deed obtained by the defendant from complainant and for an accounting and other relief.   These two causes were heard as one in the court below, and after a hearing a decree of divorce was granted complainant without alimony, and a decree setting aside the deed, and other relief, but reserving the matter of an accounting for further consideration, was also granted.   From both of these defendant has appealed, and complainant has also filed a claim of appeal from that part of the decree denying her alimony, but this question is not now urged or discussed.

The complainant, at the time of her marriage to the defendant, July 7, 1910, was 56 years of age, and the defendant was 46.   She was born and had lived all her life in the city of Detroit.   She had been married and had one child by that marriage, a son, who died in 1898.   During her first marriage she lived with her parents.   Her mother died in 1904, her husband in

June, 1909, and her father on June 6, 1910, at the age of 82 years. From childhood she had enjoyed good educational advantages, had taught music, and for two years had been organist in a church. She had been active in church and philanthropic work, having been for several years identified with the work of the Young Women's Christian Association. She was accustomed to move in refined social circles. At the time of the death of her father she became possessed of real estate to the amount of about $35,000 and personal property of about $10,000. This real estate consisted of the homestead of complainant's father at the corner of Bagg street and Third avenue, two brick double houses facing on Bagg street, and a double frame house, 480-482 Third avenue.

The defendant had also been married and has two sons. He had known the complainant for many years, and after the death of his first wife he was frequently invited to the home of complainant by her first husband. After the death of her husband the defendant continued to be kind and helpful to the father of complainant and volunteered to look after extensive repairs which complainant's father had arranged to make upon one of his buildings. This was done by defendant as a matter of friendship, and moneys were advanced by complainant to carry on this work amounting to about $5,000, and it is claimed that no attempt was made by defendant to account for these moneys until after the bill for divorce was filed, although he was often requested to do so. The defendant remained at complainant's home during the last illness of her father for three months, taking care of him, and after his death complainant claims that, upon the insistent urging of the defendant, she consented to marry him, and the ceremony took place on July 7, 1910. It had been decided that, because of the nervous strain she had undergone owing to the death of her husband and her father, it would be advisable

for her to have a rest and change, and so it was planned to take a trip abroad as a wedding trip. They left for Atlantic City on the day of the marriage, where they remained one week, and then sailed for Europe and spent about 118 days away from home. The record is replete with the incidents of this trip and might serve well as a travel book. If the trip had been made under favorable circumstances, it could not have failed to be a most enjoyable one. They visited the British Isles, Belgium, France, Germany, Switzerland, Italy, and Spain.

It would be of no particular value for the purposes of this case to set up all of the incidents complained of, but it is sufficient to say that from the very day that they embarked in New York until their return it seems to have been one constant bickering and quarreling. Complainant, because of her physical condition, was anxious to go to some place for rest, but the defendant, filled with what under other circumstances might have been a very commendable desire, seems to have been anxious to cover as much territory and see as much as he could. In this, complainant says, he did not consider at all her condition, and after a tour of the British Isles she became so ill that she was compelled to stay in Brussels and called upon her physician from Detroit, who happened to be in Europe. The physician testified that she found complainant quite ill, and this visit gave rise to a very unpleasant incident. The physician was apparently *persona non grata* to the defendant, and he resented her being there, quarreled with his wife about her, and threatened to leave complainant and continue his journey alone. This discloses what seems to have been characteristic of the disposition of the defendant, his apparent desire to have his own way in everything, and his failure to show that consideration to his wife that she, it would seem, especially in view of her physical condition, was entitled to from the man who had made

her his life companion and had agreed to love and cherish her.

There are many other incidents that might be arrayed to show this characteristic of defendant, but we think that the learned trial judge who heard the testimony was fully justified in the finding which he made:

"From the first there seems to have been a disposition on the part of the defendant in this case to, in a certain sense, dominate every action of his wife. There is much in the European trip, I think, which does not throw a vast deal of light to the court, and I can readily understand, perhaps, that, with the strength of 45, the defendant in this case did not appreciate the tiring effect of a continued trip of sightseeing. If there is any one thing that is wearying, that is it, and while, perhaps, in a sort of impatience and insistence that she should accompany him, there may not have been cruelty, in the later and subsequent actions of the defendant I think there was that cruelty that authorizes a court to grant a divorce. I can hardly understand the insistence of the defendant of an almost absolute control over the complainant. If he had been 45 and she 25, a certain jealousy, if it is jealousy that is apparent in this case, might be more easily explained; indeed, I do not think it was a matter of jealousy; I think it was simply a desire on his part to an absolute control of his wife, and to an end which seems to me to have been unworthy."

On her return home he insisted on her having no friendly relations with people with whom she had associated before her marriage and to whom he had taken a dislike, and insisted upon her notifying them that they would no longer be welcome in their home. This she hesitated to do, for the reason, as she claims, that it would unnecessarily humiliate her, but suggested that he might telephone them and express to them his wishes and that she would acquiesce. This he declined to do and said, "No, madam, you are the one to do that, not me." On one occasion the brother of her first husband was invited to their house to try

to effect a settlement of their difficulties, and he testified as to what occurred, in part, as follows:

"He said the whole trouble, this trouble is brought about about the property; and Mrs. Southwick says, 'The real truth of the matter is he wants me to give him a joint deed of all my property and I don't want to do it;' and he says, 'I don't want you to give it to me;' he says, 'I want to buy it.' 'Yes,' she says, 'he wants to buy it, and he wants to give his note for it.' 'Yes,' he says, 'I do; I want to buy the half interest. I don't want her to give me anything; I will buy it, and I will. I will give her my note for it, and I will pay the notes with the increased revenue, which I will receive from this property, which I will improve.' That is the way I understood. About the income, how it should be kept as between them, he says, 'One joint account—100 per cent. of her love and her confidence and of her property—I want it all held jointly; no separate accounts of any kind whatsoever.' I refrained at that time from giving any advice, except to state that, 'You people must get together. You people must make this matter up in such a way that you will get along and it will not be made public.'

"*Q.* Now during that occasion, did he shake his fist at this woman? Just state to the court. (Objected to as leading.)

"*A.* He went up to her with his paper in his hand. He says, 'Madam, I want you to understand I will not stand for it; I will not permit you for to permit these people to come into this house; I will not permit these people to come here and make this place a receiving room.' I don't know as that is it, but anyhow, 'I will not permit them to come here; I will not permit them to come here, and it is your duty as a true wife, if you love me, if you love me as you ought to love me and as I love you, you will forbid them coming here.' She says, 'I never invited them here; I knew those people long before I married you, and I do not know anything but good of them, and I cannot possibly do that, but if you want to do it you can do so.' He did not fully agree to that, but after the interview I said, 'Now, you people just settle this matter yourselves and get together.' And he said, 'All right;' and he took her by the arm and pulled her to him and he said,

'Well, we will try.' I don't mean to say that he hurt her or anything of that kind, but he pulled her to him and kissed her. But he made a serious charge against her there; he made a charge of such a nature that to me, who has known her fully all these years, placed him in my eyes as a tyrant; he charged that she proposed going to live with him, but keep it quiet, and I supposed at the time that he wanted me to draw the conclusion that she was coming to him without marriage and as his mistress. That was the impression I got, and I repulsed it at once; I refused to stand for any such statement as that. She says, 'I would not stay under this roof another hour, and a man that will be so low and mean and contemptible as to bring such a charge as that in my presence, to my brother-in-law, I could not live another minute.' 'Well,' he said, 'you said it, didn't you?' and she said, 'Yes, I said it in this way;' and then she told. She says, 'I proposed coming here after our misunderstanding, and after you had attended father night and day and our neighbors and friends that I was practically compromised to you as your future wife.' She says, 'I was ashamed; I was ashamed to have it otherwise; and I thought I could come in here to the home as your married wife and keep the home and mother the boys—the children —the boys, and practically live separate from each other, not as husband and wife, except in the eyes of the people.' 'Well,' I said, 'now, Will, you know, you know in your heart and soul that Mrs. Southwick never intended to do a wicked deed like that.' 'Well,' he says, 'all I know is what she said.'"

Defendant seeks to explain this incident and give it a different meaning, but if the witness is to be believed, and a careful reading of his testimony shows no bias but an evident desire to tell the facts, this insinuation made in the presence of her brother-in-law, in view of the character of the complainant, was, it seems to us, in itself such extreme cruelty as would justify the court in granting a decree. The troubles between the parties continued until December 21st when complainant left her home.

On the 5th day of December, after considerable

wrangling about the property matters, she consented to go to a lawyer's office and did there execute a deed of the house and lot on Third avenue to the defendant. It appears that this property was worth approximately $8,500. The lawyer who drew the deed testified as follows:

"*Q.* During the time the parties were there and before the drawing of the deed, was the question of what kind of a deed should be made discussed?

"*A.* Yes, sir. Well, I don't know as I can tell the court precisely what was said; the substance of it was that Mr. Southwick desired a warranty deed, and I advised Mrs. Southwick that there was no occasion for giving a warranty deed; that, inasmuch as this was a gift of the property to him, I thought he ought to be satisfied with taking whatever she had in it, and had no call to covenant for the title. That remark was made in the presence of Mr. Southwick. I understood he acquiesced in taking the quitclaim deed; he was present all the time; we were all talking together there; we were all in the office together. And then this deed was drawn.

"*Q.* Was there any valuable consideration spoken of in your office as being paid for this conveyance?

"*A.* No, sir; nothing more than— all that was said was, Mrs. Southwick, for the reason of making the deed, Mrs. Southwick said she wanted to give this property to Mr. Southwick in payment of her appreciation of the kindness and attention which he had shown to her father.

"*Q.* Now what was said by Mr. Southwick, if anything, about the purpose with reference to this title?

"*A.* Some time before they left the office, and I think after the deed was completed, as well as I recall it now, Mr. Southwick told me that it was his intention to enlarge and improve this property and to put the title in himself and his wife jointly.

"*Q.* At the time these parties were in your office, did you observe the condition of Mrs. Southwick and her manner and attitude with reference to this?

"*A.* Yes, it made an impression on me.

"*Q.* Will you state to the court what that attitude and conduct—what the impression that you got from it was?

"*A.* I derived the impression that she was not very happy in the making of the gift, and it was not absolutely spontaneous; that is the impression that I gathered from the whole course of events in the office, her manner and appearance, but nothing was said about it in any way, shape, or manner other than just as I said before.

"*Q.* How vivid was that impression in your mind?

"*A.* Well, it remained strong enough on me so that I mentioned it to my wife that night.

"*Q.* Can you describe more fully her appearance and what occurred there that gave you that impression?

"*A.* No, sir; I could not, except as I say there was a look of what seemed to me a sort of repression or something; I could not exactly define it; it would be a very difficult thing for me to define just what it was; simply to say that it left that impression upon my mind."

After the deed of this property was obtained, complainant requested that she be allowed to manage her own property and that he might attend to what she had given him, but this, she claims, he also refused to do, and it resulted in further quarreling, which finally led to the separation.

We are impressed with the fact that a great deal of the testimony heard upon the hearing was immaterial and irrelevant, and many of the incidents complained of, taken by themselves, seem trivial and were of such a character as might occur in almost any family; still the conclusion cannot be escaped that upon the whole record, considering only those facts which should properly be considered, a case has been made out. The result of defendant's conduct from within a few days after the marriage up to the time of the separation was to practically destroy the marriage relation. As Justice Cooley said in *Briggs* v. *Briggs,* 20 Mich. 34, 45:

"Our conclusion upon the whole case is that such a case has been made out as to warrant a divorce. The

statute provides that the divorce may be decreed 'for the cause of extreme cruelty, whether practiced by personal violence or by any other means.' We are not required, therefore, to look solely at the violence employed by defendant, but in disposing of the case may properly have regard to the general result of his conduct. That conduct is properly to be characterized by the result which it has produced upon the marriage relation and upon the comfort of the complainant therein. A single act of causeless violence may be overlooked if its consequences are evanescent, and leave the relations of the parties substantially undisturbed; but a long-continued course of conduct, which, without the fault of the wife, results in making the marriage relation unendurable and in driving her from her husband's house, is clearly, we think, a case of extreme cruelty within the meaning of the statute. In its effect upon the marriage relation, cruel conduct, which has effectually destroyed it, cannot be regarded as other than extreme."

*Warner* v. *Warner,* 54 Mich. 492 (20 N. W. 557); *Walsh* v. *Walsh,* 61 Mich. 554, 560 (28 N. W. 718); *Bailey* v. *Bailey,* 121 Mich. 236 (80 N. W. 32); *Kraft* v. *Kraft,* 160 Mich. 654 (125 N. W. 693).

With reference to the decree of the court below setting aside the deed of the property in controversy, it would seem sufficient to state the rule that:

"When the question of fraud is raised in connection with the validity of the wife's conveyance to her husband, the burden is upon the husband to show that the same was fair and free and voluntary on her part." 21 Cyc. p. 1293.

The property matters were the subject of controversy from the very first, and defendant insisted on managing complainant's affairs. She testified with reference to his conduct as follows:

"I felt myself getting weaker every day under his treatment because he was so constantly ugly, and I could not sleep at night, and I would get up in the middle of the night in a cold perspiration thinking of what I had gone through and what was before me;

I did not know what to do. And about this time he again began about the joint deed, and I went upstairs with him to talk business, and he said, and he shut the door and he began talking about the joint deed, and really I was in such a condition and I was so utterly hopeless; I could not see my friends and could not go anywhere, and I hardly knew what to say or do; anything for peace; I would have been so glad to have given all if it only could have brought peace so that we could have lived together, because I dreaded so going out alone. So when I was up there he commenced with these joint deeds and I finally told him —well, I thought to myself—$50 a month I would not freeze; I could get enough to keep me warm with that, if I had to keep a house; I did not know how far $50 would go, but I thought possibly I could live on it, and I said if he would guarantee me $50 a month I would put the rest of it in joint deeds and he could manipulate it. I knew that meant all to me because it was very uncertain whether there would be anything left. And he grew very angry and walked up and down and pounded the table and said he would have 100 per cent. or nothing. He wanted to have the whole thing. He would not be a valet to any woman.

"*Q.* He would not be a valet to any woman?

"*A.* And he did not want me to hold my property over his head as I had over my husband John's; and that was as untrue as everything, as anything, because I had had no property to hold, but as he did not take my offer, I guess it was my father's—my old father's spirit came into me and I said, 'Well, then, you will have nothing.' And the abuse then began; he began then abusing me; when I said that he would have nothing, and told me how mean I was and how—about the same old tirade again—and how much he had done; how much he had done for me, and when was I going to show my hand; then he would remind me of the things he had done for me and when was I going to show my hand; what was I going to do for him, and finally—

"*Q.* What did he say about your things and so on?

"*A.* He said that I was false; he said that I had a damn false tongue and I had a false face and a false shifty eye, and I was as false as my false hair. And I stood there for quite a while and I could not endure

it any longer and I went out and then he would continue his tirade in songs, singing a song about his little devil. He made it up; it was improvised, about his little devil and what she did and, etc. He would keep that up sometimes until after he had returned and when I was downstairs."

With reference to her state of mind at the time of conveying the property, complainant testified:

"I had no more money, and yet he wanted these houses changed into rooming houses, and it did not seem to me the proper thing to do, and he said if he got the money by mortgages; I knew how long my father had been gathering these places and how I and my husband also, and it seemed to me that I could not have mortgages laid on them at that time, and so I was so disheartened and so worn out and weary, my heart seemed to stop; I suppose it was the nerves of the heart; I could not breathe, and I really did not know half the time whether I was— It seemed to me that I was almost dying, and when he spoke, commenced about the houses, I thought to myself, 'Well, perhaps if I would give him one and let him use his own money then he would not talk any more about my owing him so much, and also would perhaps go to work and let me alone, and we might have a little peace;' and with the thought of that in mind (the thought that I might stay with him a little longer and have a little peace at home) I told him, 'Now, I will give you one of those houses.'"

The record in this case clearly brings the transaction within the principle announced by this court in *Stiles* v. *Stiles*, 14 Mich. 72, and commented upon by Justice CAMPBELL in *Witbeck* v. *Witbeck*, 25 Mich. 439, 442, as follows:

"It seems to be supposed by the defendant that, in order to invalidate an agreement between husband and wife, she must make out the same full and positive showing of actual fraud or duress as against a stranger. The law certainly does not prevent persons in this confidential relation from doing, without urgency, of their own accord, and under the natural impulses of kindness and affection, such generous acts

as are the results of mutual confidence and good will. But the same principle which encourages confidence protects it by preventing any profit to be gained from abusing it. The law recognizes the fact that a married woman is easily subjected to a species of coercion, very much more effectual than any ordinary operation of fear or fraud from strangers. It has always been found necessary to examine jealously into all transactions whereby the husband gets an advantage over the wife, not plainly spontaneous on her part. Any undue advantage gained by the use of the marital relation is a legal fraud on the wife, which courts of equity will not allow to stand to her prejudice. We are not called upon, in the present case, to weigh any trifles, for it is very plain that defendant had determined to let no scruples of delicacy or good feeling interfere with his scheme, and that, when the wife finally gave way, it was because there was no other way to purchase peace. To use her own expression, as she was going over to Holland, to make the papers, she did it 'rather than live in torment all the while.' "

We are satisfied that the defendant obtained the deed in question by coercion exercised as a result of the relationship that existed between them, and it was not the free, fair, and voluntary act of the complainant. The court below arrived at the proper determination in setting aside the deed. Provision is made in the decree for an accounting between the parties in relation to complainant's moneys intrusted to him and with reference to the labor performed and improvements made by defendant and providing for a lien upon the property, if any sum is found to be due said defendant, but denying defendant the right to recover for any services rendered in improving and repairing the Bagg street property. No alimony is allowed in the divorce decree.

With all of this we agree, and both decrees are therefore affirmed.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.