FIRST NATIONAL BANK & TRUST COMPANY OF MARQUETTE, MICHIGAN v ALBERT

(ESTATE OF ALBERT v ALBERT)

1. FIDUCIARIES—EVIDENCE—BENEFITS FROM RELATIONSHIP—PRESUMPTIONS—BURDEN OF PROOF.

The relationship between one who is incapable of attending to his business affairs and the one he relies on to manage those affairs is a fiduciary relationship; once such a relationship is established and the fiduciary or an interest which he represents benefits therefrom, the law presumes that he in whom the trust was reposed exercised his influence unduly and the burden shifts to the fiduciary to prove the validity of the transaction.

2. EVIDENCE—PRESUMPTIONS—BURDEN OF PROOF—REBUTTED PRESUMPTIONS—EQUAL EVIDENCE—VERDICTS.

The raising of a rebuttable presumption shifts the burden of proof of the parties to an action, and where (1) plaintiff has the benefit of a presumption which has been rebutted and, thus, reduced to a permissible inference; and (2) the trier of fact determines the evidence of plaintiff and defendant to be equal, the trier of fact should return a verdict for the plaintiff.

3. APPEAL AND ERROR—CONFLICTING TESTIMONY—CHOICE—DE NOVO REVIEW—RECORD—DIFFERENT RESULT.

A trial court which hears sharply conflicting testimony may properly choose which testimony to believe, and an appellate court, in its *de novo* review will not disturb that decision where it is supported by the record unless the appellate court determines that it would have reached a different result.

Appeal from Gogebic, William F. Hood, J. Submitted October 14, 1975, at Marquette. (Docket No. 22244.) Decided December 10, 1975. Leave to appeal applied for.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 39 Am Jur 2d, Guardian and Ward §§ 221, 212.
[3] 5 Am Jur 2d, Appeal and Error §§ 703, 772, 882.

Complaint by the First National Bank & Trust Company of Marquette, Michigan, executor of the estate of George Albert, deceased, against Samuel G. Albert and Fred G. Albert to recover funds belonging to the estate. Judgment for plaintiff. Defendants appeal by leave granted. Affirmed.

*Kenney, Kenney, Chapman & Prather* (by *Arthur W. Miller),* for defendants.

*Kendricks, Bordeau, Casselman & Adamini, P. C.,* for plaintiff.

Before: ALLEN, P. J., and DANHOF and M. F. CAVANAGH, JJ.

ALLEN, P. J. The instant conversion suit brings to the Court's attention another appeal in a series of litigation involving the Albert family of Ironwood, Michigan. To our knowledge, no family has contributed so much to the length of the bookshelves of the Michigan Bar.[1]

The facts concern the last year of the life of George Albert who died on November 24, 1970, at age 82, leaving by will an estate of approximately $250,000 to be equally divided among his ten children. From a judgment in favor of the executor requiring repayment to the estate of $33,400.00, plus interest, defendants appeal.

George Albert was a remarkable, independent, irascible, and affluent man. He imparted his fierce independence and much of his affluence to the siblings who participated in the instant family

---

[1] *Albert v Gamble-Skogmo, Inc,* 335 Mich 539; 56 NW2d 263 (1953), *Albert v Gogebic County Hospital,* 341 Mich 344; 67 NW2d 244 (1954). *People v Albert,* 358 Mich 647; 101 NW2d 378 (1960), *In re Albert,* 383 Mich 722; 179 NW2d 20 (1970), *State Bar Grievance Administrator v Albert,* 389 Mich 153; 206 NW2d 729 (1973), and 390 Mich 234; 212 NW2d 17 (1973), *Samuel G. Albert v First National Bank* (now pending before Court of Appeals, Docket No. 22909).

squabble: Samuel Albert, a physician in Ironwood; Fred Albert, a doctor of podiatry in Austin, Minnesota; John Albert, who owns the family clothing store; James Albert, a doctor of podiatry in Ironwood; Michael Albert, who worked in the family clothing store; and La Mese K. Davies. During the summer of 1969, the aged and terminally ill George Albert returned from the hospital at Duluth, Minnesota to his home in Ironwood. John Albert lived with George in the family home until December 22, 1969, and, up until October 21, 1970, took care of the father's business under a power of attorney.

By mid-December, 1969, George's health had deteriorated to the extent that family members agreed that Samuel Albert ought to take care of their father. Dr. Sam agreed to the assignment on the condition that he would be reimbursed for his services and that there would be no interference by other members of the family. From December 22, 1969, to his father's death on November 24, 1970, Dr. Sam cared for his father, charging $73,882.80 for services rendered. John Albert, acting under his then power of attorney, paid $26,876.12 to Sam during George's lifetime, leaving $47,606.75 due from the estate. The balance due has become the subject of litigation currently on appeal to this Court.[2] Dr. Sam described his father's condition when he first took over his care in December, as follows:

"His condition was very, very serious. In fact, I thought it was too late to come back on the case and do much good. But I agreed to devote all my time, that I

_____

[2] *Samuel G. Albert v First National Bank.* (Docket No. 22909) The hearing record of testimony and exhibits in the hearing on claims in No. 22909 was stipulated by counsel to be a part of the record on appeal in the instant case No. 22244.

could, as humanly possible, and he had a severe lung infection with multiple organisms that were very resistant because of the long standing exposure to various drugs that he had in the hospital. He had pulmonary emphysema. He had great difficulty in swallowing. Each time he attempted to eat, there would be repeated attacks of vomiting. And, with each attack of the vomiting, he would have a certain amount of aspiration into the lungs. He had Parkinson's—and he was unable to do an awful lot of things—I think could have been prevented—before—He had a large hydrocele; he had a large inguinal hernia; he had difficulty in speech, but he could, at all times, not only then but even later, comprehend and communicate with us through gestures —through saying, "yes" and "no" and, often times,— earlier in the care that I had—he was making complete statements—those would vary from period to period. But he was in constant need of care right around the clock."

Dr. James Albert, disputing Dr. Sam's contention that George was mentally alert, testified as follows with respect to the condition of his father in May, 1970:

"*Q.* Could he get out of bed by himself?
"*A.* No, he could not.
"*Q.* Could he walk?
"*A.* No, he could not.
"*Q.* Could he engage in a conversation?
"*A.* He would—He would respond to "Yes"—with a "Yes," or a "No" answer. But my dad would answer "Yes" to almost anything if you asked in a—in a positive way, he would answer in a positive—If you asked him in his a negative—he would answer in a negative—

"*The Court:* Are you trying to say that, in his condition then—his physical condition, his mental condition, then—that he was subject to being easily influenced;

"*Witness:* Yes.

"*The Court:* In responding?

"*Witness:* Yes I would say—"

During the summer and early fall of 1970, the children feuded over their father's affection and the conditions which Dr. Sam had established for George's care. Mike and James charged that all of the family, save John and Fred, were barred by Dr. Sam from visiting their father. Mike, locked out of the home in March, 1970, broke the front window to enter. La Mese, upset that her father had deeded the family clothing store to John, returned home where it is claimed George informed her that he had not intended to make the gift to John. On the other hand, Dr. Sam contended that he did deny access to certain family members both because they upset his treatment of George and because George, irritated that they had sought to declare him mentally incompetent in 1969, did not want them to visit.

Following the window breaking incident, Dr. Sam moved George to Sam's own home after which he added $45 a day to his monthly bills for George's care. The bills were submitted to John, who was authorized to pay them under the power of attorney which he then held. In May, 1970, Sam demanded payment in full of the charges he had made to date; but John refused on the grounds of lack of cash. This difference was resolved when Sam accepted payments in part, but by October when Sam again demanded payment in full, John elected to withdraw as attorney in fact. Accordingly, a new power of attorney, naming Fred as attorney in fact, was prepared and signed at Sam's home on October 21, 1970. On November 12, 1970, a new power of attorney granting Fred Albert broader powers was executed at Sam's home. Each document was drafted by former congressman and

attorney, Frank Hook, and signature was obtained by either Fred or attorney Hook guiding decedent's hand. None of the children, save Dr. Sam, were present when the documents were signed. However, attorney Hook and Dr. Sam claimed George was fully aware of what was being done and that it was at George's request that the papers were prepared.

Two days after the execution of the second power of attorney Fred and Sam signed a promissory note under which Sam, in consideration of $35,000 paid to him by his father, would repay the obligation ten years after date without interest.[3] Sam admitted that the idea of a loan was initiated by him in conversation with his father, and that he suggested the terms of the loan:

"*Q.* Well, Doctor, so you decided you would approach your father for a $30,000 loan and take it as a loan rather than receiving payment on your medical fees on which you would have to report income?

"*A.*That's right.

"*Q.* And who decided that it would be a ten-year loan?

"*A.* I decided for a ten-year loan.

"*Q.* Did you ask your father for $30,000 for ten years at zero percent interest? In other words, did

---

[3] "November 14, 1970. Ten years after date, for value received, the undersigned promises to pay to the order of Mr. George Albert, thirty-five thousand dollars ($35,000.00) . . . with no added interest charges.

Signed /S/S. G. Albert, M.D.

Date November 14, 1970

"This loan is made through the undersigned, acting as Power of Attorney for Mr. George Albert with his full knowledge and at his specific request. Funds to cover this loan are to be made available through the sale of certain securities and supplemented by cash if necessary as agreed to by Mr. George Albert on this November 14, 1970.

Signed /S/ Fred G. Albert, D.P.M.

Dated 11/4/70"

you suggest the terms, or did your father suggest the terms?

"*A.* I suggested the terms of it. I am making the request. I made the request a number of times and I said, 'We will draw up the note.', and he said 'I don't want any note. I want to give it to you.', and as gift I would have to pay a gift tax."

Though the note was both signed and dated November 14, it was impossible to advance Fred $35,000 until certain securities were first sold. On November 23, some of the certificates of stock which were in the name of John and his father as joint tenants were endorsed by John. Other certificates of stock which were in the name of La Mese were not endorsed by her, but a blank stock power which had been executed by her some time earlier was used to endorse the certificates. About 1 a.m. on the morning of November 24, Fred left Ironwood for his home in Austin, Minnesota taking with him the promissory note and the signed stock certificates. About 11 a.m. November 24, Fred, who had arrived in Austin, opened a power of attorney account in the Austin State Bank and wrote a check payable to Sam in the amount of $35,000. He then mailed the check to Sam in Ironwood together with a letter that Sam was not to cash the check until the securities were sold and the funds to cover the check deposited in the Austin bank account. During the afternoon of November 24 George died.

Sometime after George's death, but before December 21, Sam endorsed "for deposit only in the Northwestern State Bank in Austin, Minnesota" the $35,000 check and either mailed or personally delivered it to Fred. On December 21, Fred received checks for $32,537.39 from the brokerage

firm handling the sale of securities. Also, on December 21, Fred deposited the checks so received, plus $1,600 of his own money, making a total balance of $35,041.75 in the power of attorney account. On the same date, the $35,000 check was delivered by Fred to the bank and *applied in payment of a promissory note given by Sam to the bank for $32,983.22, and which note was due December 24, 1970.* Brother Fred had endorsed the note and was liable as a joint maker. The check for $35,000 cleared that day leaving a balance in the power of attorney account of $41.75. The loan by the Northwestern State Bank to Sam had been made several years earlier and was for the purpose of purchasing securities. Fred received no money on the loan but signed the note because the bank demanded the signature of a Minnesota resident. From time to time the note had been renewed. Correspondence from the bank was introduced in evidence showing that on June 16, 1970, the bank had noted that the market value of the securities had dropped and requested that the balance of the loan be considerably reduced.[4] The last renewal note was dated September 24, 1970, due in 90 days and was mailed by the bank to Dr. Sam by letter dated September 29, 1970, a portion of which reads:

> *"According to our earlier comment I thought that you probably would be reducing the principal at this time by some amount.* Our collateral position is more in line than what it had been earlier in the year, however,

[4] "In reviewing this line of credit, we find that *we are considerably under collateralized.* Because the stock values have decreased considerably in the last few months, *it is necessary for us to ask you for a reduction on this loan in the amount of $16,000.00.*

"According to a previous comment by Clarence Smith in December of 1969, *this note was to be considerably reduced at this time or possibly paid in full."* (Emphasis supplied.)

I am sure you know that by cashing in the Saving Certificates we reduced the collateral value which we were holding in connection with this loan.

"I am enclosing *a new note for $32,336.49 to mature in 90 days*. Please sign the note where I have placed the X and return it to me. *We are still expecting a substantial reduction on this line of credit when the present note matures.* " (Emphasis supplied.)

In a detailed opinion, the trial court ruled in plaintiff's favor giving as its reasons: 1) the so-called loan to Sam Albert constituted a gift, and, since the power of attorney dated November 12, 1970, did not authorize the attorney in fact to give away the principal's property—either permanently or for any extended period—the attorney in fact exceeded his power; 2) defendants failed to overcome the legal presumption, arising in cases involving a doctor-patient or attorney-client relationship, that the loan was the result of undue influence; 3) even if the reasons stated in 1 and 2 were nonexistent, the power of attorney terminated at George Albert's death, and Fred Albert was without power to sell the securities or deposit the $35,000 check in the Austin Bank. Accordingly, the court concluded that, except for the $1,600 contributed by Fred from his personal funds, the application of proceeds on December 11, 1970, from the sale of securities towards payment of the $35,000 check was a conversion of funds which belonged to decedent's estate.

Fred Albert's counter-claim for a return of the $1600.00 was rejected, and judgment was entered against defendants, jointly and severally, for $33,-400 plus interest.

We opine that the lower court reached the correct result based upon the grounds stated in number 2, above. It is undisputed that there was a

doctor-patient relationship between George and Sam Albert. Equally clear, is the power of attorney-business relationship between George and Fred Albert. The law deems such to be fiduciary and confidential relationships. See Annot, *Undue Influence in Non-Testamentary Gift from Patient to Physician, Nurse or Other Medical Practitioner,* 70 ALR2d 591. A fiduciary relationship also exists where, as in the instant case, one who is enfeebled by poor health and incapable of attending to his business affairs, relies on another to manage his business affairs. *Williams v Griffin,* 35 Mich App 179, 184; 192 NW2d 283 (1971). In the landmark decision *In re Wood Estate,* 374 Mich 278, 285, 289; 132 NW2d 35 (1965), our Supreme Court recognized that:

"Once such a relationship is established and the fiduciary or an interest which he represents benefits therefrom, the law recognizes a presumption that he in whom trust was reposed exercised his influence unduly.

\* \* \*

"The immediate legal effect of a presumption is procedural—it shifts the burden of going forward with the evidence relating to the presumed fact." (Footnote omitted.)

The *Wood* principle has been followed in a number of cases holding that where the confidential relationship exists, it is presumed the gift to the fiduciary was obtained via undue influence. *Totorean v Samuels,* 52 Mich App 14; 216 NW2d 429 (1974), *Taylor v Klahm,* 40 Mich App 255, 265; 198 NW2d 715 (1972), *Williams v Griffin, supra.*

Defendants do not question the *Wood* rule, but argue under authority of *Williams v Griffin, supra,* that the ultimate burden of proof remains with plaintiff, and plaintiff has failed to carry the bur-

den. We are unable to agree for two reasons. First, it is uncertain that the ultimate burden of proof as to undue influence remains with plaintiff in a case of this statute. Indeed, a panel of this Court in *Totorean v Samuels, supra,* rejected the reasoning of *Williams* and ruled the burden of proof remained with the recipient of the beneficence:

"We think the *Williams* Court misread Wood. We read *Wood* as standing for the proposition that a rebuttable presumption shifts the burden of proof. * * * Therefore, in those cases where (1) plaintiff has the benefit of a presumption which has been rebutted and, thus, reduced to a permissible inference; and (2) the trier of fact determines the evidence of plaintiff and defendant to be equal, the trier of fact should return a verdict for the plaintiff. This can only mean the ultimate burden of proof is on defendant—not plaintiff." *Totorean, supra,* 52 Mich App 14, 21.

Under this standard, the instant record shows defendants' evidence was insufficient to overcome the permissible inference of undue influence. Secondly, we do not rest our conclusion on *Totorean per se.* Assuming, arguendo, the *Williams* decision represents the more sound statement of the law,[5] we still believe that the trial court decision was not erroneous.

In essence, the trial court confronted sharply contrasting theories of the case as articulated by the feuding siblings. Sam, Fred, and attorney Hook testified that despite his physical infirmities, George Albert was fully aware of what he was doing, had a history of giving gifts to his children, requested the second power of attorney be drawn so that he could legally make the loan, was helped

---

[5] For a full discussion of *In re Wood Estate,* see Callahan, *Trusts and Succession,* 20 Wayne L Rev 715, 727 (1974).

to sign the powers of attorney only because he had Parkinson's disease, and that he actually preferred to make a $35,000 gift to Sam rather than a loan, but knowingly agreed to Sam's proposal that the transaction be a ten-year loan without interest. It is pointed out, moreover, that other family members were barred from Sam's home solely because their presence disturbed the seriously ill father, and that there was little pressure on Sam or Fred by the Northwestern State Bank to repay the 1968 note.

On the other hand, there is James Albert's testimony that his father was easily led, and would respond yes or no depending on how the question was framed. He testified that from March until George Albert's death Sam Albert excluded all the children but Fred from the home, and as early as 1969, Sam was worried about his indebtedness to the Northwestern State Bank. In addition, John Albert testified Sam had local indebtedness, and that after John's power of attorney was revoked in October, 1969, he was told by Sam that his presence in the house was unwanted. Of all the witnesses, the two witnesses most removed by relationship from the Albert family were Louis Patek, the notary public and Kathleen Richards, a nurse who cared for George Albert from the time he returned home from the hospital in Duluth in May, 1969, until Dr. Sam took over in late December, 1969. Their testimony tends to support the findings of the trial court. On three occasions Mr. Patek was asked whether at the time the two powers of attorney were signed, George Albert acknowledged in any way that he understood that he was signing. Each time Patek avoided a direct answer by responding that he was unqualified to answer the question since he really did not know what George Albert's mental state was at the

time. Upon inquiry by the trial judge as to whether George Albert would yield to pressure, Mrs. Richards responded:

> "*The Court:* There has been a statement made here that Mr. Albert was subject to being persuaded to do things very easily—with anybody putting pressure on him. You seem to imply that by the question in your last statement here.
>
> "*Witness:* Oh, I think that I could persuade him to do things. Oh, yes.
>
> "*The Court:* Was that also true with respect to members of the family?
>
> "*Witness:* Oh, certainly. John could persuade him to eat, and he could persuade him to go to bed.
>
> "*The Court:* All right.
>
> "*Witness:* He was—
>
> "*The Court:* He was very—if somebody put pressure on him, he would give in; was that it?
>
> "*Witness:* Yes."

The letters from the Northwestern State Bank which were introduced in evidence rebut the testimony of Dr. Sam that there was little pressure placed on him or Fred to pay or substantially reduce the notes due at the bank. Thus, although the issue is admittedly close, our careful reading of the record leads us to conclude that the finding of the trial court is record-supported.

Our conclusion in this regard is buttressed by the recognized rule of law that where a trial court hears sharply conflicting testimony the court may properly choose which testimony it disbelieves. Although Sam and Fred were the only witnesses to personally testify before the trial judge,[6] it is

---

[6] In the trial proceedings only Sam and Fred testified personally. The testimony of Frank Hook and Louis Patek was by deposition. The testimony of other family members was given before the probate court in the hearing on claims and the record thereof was stipulated as part of the record in the instant appeal.

apparent that the court did not choose to fully believe them. An appellate court ought not disturb the lower court's decision of whom to believe. *Cf. People v Doris Anderson,* 64 Mich App 218; 235 NW2d 746 (1975). Moreover, even though appellate courts review cases involving equitable matters *de novo,* we will not reverse the findings of the lower court unless we would reach a different result. *Opal Lake Assoc. v Michaywé Limited Partnership,* 63 Mich App 161; 234 NW2d 437 (1975).

We do not imply that defendants committed intentional fraud in the sense that that term is used in the criminal statutes or as commonly understood by the general public. Neither do we imply that Dr. Sam did not properly care for his father. The record is quite the contrary. But we do state that after a meticulous review of the record, we are neither firmly convinced that the evidence in rebuttal of the presumption arising in cases involving gifts made where there is a doctor-patient or other confidential relationship was overcome by defendants, nor that the trial court erred in its findings of fact.

Affirmed, costs to plaintiff.