KAR v HOGAN

Docket No. 56383. Argued June 4, 1975 (Calendar No. 5).—Decided
December 31, 1976.

Plaintiffs Edward W. Kar and Irene Altshuler brought a com-
plaint in Wayne Circuit Court, George E. Bowles, J., to avoid a
deed made by their deceased stepmother, Julia Kar Merkiel, to
defendant Edward Merkiel, whom she married after the death
of the plaintiffs' father, John Kar. Edward Merkiel died after
the complaint was filed and Fred H. Hogan, his executor, was
substituted as defendant. The plaintiffs allege that the deed
was a product of undue influence; after trial, the circuit court
granted judgment for the defendant. The Court of Appeals,
J. H. Gillis, P. J., and Van Valkenburg, J. (D. E. Holbrook, J.,
dissenting) affirmed (Docket No. 16953). The plaintiffs appeal.
*Held:*

1. The ultimate burden of proof in undue influence cases does
not shift; it remains throughout trial with the party asserting
undue influence. The plaintiff may raise the presumption of
undue influence by evidence establishing (1) that there was a
confidential or fiduciary relationship between the grantor and a
fiduciary, (2) that the fiduciary or an interest he represented
benefited from the transaction, and (3) that the fiduciary had

REFERENCES FOR POINTS IN HEADNOTES
[1, 3] 23 Am Jur 2d, Deeds § 154.
    25 Am Jur 2d, Duress and Undue Influence § 36.
[2, 4, 5, 16, 17] 23 Am Jur 2d, Deeds §§ 148–152.
[6] 23 Am Jur 2d, Deeds § 140.
[7] 23 Am Jur 2d, Deeds § 61 *et seq.*
[8] 5 Am Jur 2d, Appeal and Error § 966.
[9] 5 Am Jur 2d, Appeal and Error § 822.
    27 Am Jur 2d, Equity §§ 241, 242.
[10] 27 Am Jur 2d, Equity § 87.
[11, 12] 5 Am Jur 2d, Appeal And Error § 820.
[13] 5 Am Jur 2d, Appeal and Error § 703.
[14] 23 Am Jur 2d, Deeds § 148.
[15] 27 Am Jur 2d, Equity § 22.
[18, 20] 41 Am Jur 2d, Husband and Wife § 134.
[19] 7 Am Jur 2d, Attorneys at Law § 34.

an opportunity to influence the grantor's decision in that transaction. The burden of persuasion remains with the plaintiff throughout the trial, but the burden of going forward with evidence that the transaction was free of undue influence is on the defendant once the presumption is raised. The plaintiff may satisfy the burden of persuasion with the presumption of undue influence, which remains as substantive evidence; the plaintiff will always satisfy the burden of persuasion when the defendant fails to offer sufficient evidence to rebut the presumption.

2. The trial judge properly found that the defendant had rebutted the presumption. Mrs. Merkiel was 72 years old and suffered from a decline in her physical condition. However, witnesses for both parties testified that she was strong-willed and mentally competent and capable of handling her own business affairs. The defendant established that she sought out and retained independent counsel and supplied the impetus behind the procurement of the deed.

3. The record does not support the plaintiffs' allegation that they were deprived of due process by the judge's declaration of his decision as to the disposition of the case before hearing all the evidence. After the plaintiffs closed their proofs, the judge made an ambiguous, unsolicited statement concerning the disposition of the case, but shortly after that he ruled in favor of the plaintiffs on an evidentiary issue and allowed the plaintiffs to reopen their proofs. The plaintiffs were afforded a meaningful opportunity to present their case, and the circuit court weighed the facts and law and delivered an 18-page written opinion in which he again ruled in favor of the plaintiffs on the evidentiary issue.

4. The deed between husband and wife was valid without consideration; the fact that the consideration of $1000 recited in the deed was never paid does not avoid it. This is not a case where the lack of sufficient consideration is good cause to invalidate a deed, such as in a case where creditors are defrauded.

Chief Justice Kavanagh agreed that the trial judge did not commit reversible error by his statements at the close of plaintiffs' case, that the absence of consideration did not invalidate the conveyance, and that the plaintiffs did not meet their burden of proof on the question of undue influence. However, he wrote separately that it is not necessary or wise to discuss in this case the evidentiary effect to be given a presumption once contradictory evidence has been introduced. The only concern on review in this judge-tried case is whether the

appellate court would reach a different result after an independent review of the entire record.

Affirmed.

Justice Levin dissented. The "clearly erroneous" standard by which the findings of the trial judge are reviewed on appeal in this action, as in any action tried without a jury or with an advisory jury, requires sifting the evidence with a "judicial sieve" of "finer mesh" than the one employed on review of a jury verdict. The opinion of the Court suggests that it, with undue deference to the trial judge's findings, may not have employed the finer mesh in this case.

Undue influence is persuasion that abuses a relationship. Whether influence is undue depends on the circumstances of the particular case. In the familial context the presumption of undue influence may arise when the following circumstances, or some of them, are present: the person apparently assenting was susceptible to improper persuasion, there was an opportunity to exert such pressure, the person benefitted indicated a disposition to take the initiative, the arrangement was unusual, it was clothed in secrecy, and the timing or other circumstances raise suspicion. These factors were, in combination, present in this case, and a presumption of undue influence arose because of them, not because Julia and Edward Merkiel were husband and wife or because it is assumed that the husband is the more dominant. Apart from the presumption, there was compelling evidence of undue influence in the admission by Edward Merkiel that if Julia had not come to his terms he "would have bowed out of the picture". This is evidence of unfair persuasion and hence undue influence. Evidence that Julia was of sound mind, of strong and determined will, was bright, and knew how to buy and sell is not inconsistent with her succumbing, at a time when her health was failing, to pressure from the man with whom she lived. Justice Levin was left with a definite and firm conviction that Julia executed the conveyance to purchase peace. She was subject to persuasion abusive of the marital relationship. The decision should be reversed and the deed cancelled.

54 Mich App 664; 221 NW2d 417 (1974) affirmed.

OPINION OF THE COURT

1. DEEDS—UNDUE INFLUENCE—ELEMENTS.

Proof that a deed was the product of undue influence must be established by a showing that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or

moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will; motive, opportunity, or even ability to control the grantor, in the absence of affirmative evidence that it was exercised, are not sufficient.

2. DEEDS—CONFIDENTIAL RELATIONSHIP—UNDUE INFLUENCE—PRE-SUMPTIONS.

A presumption that a deed was the product of undue influence arises from evidence establishing (1) that there was a confidential or fiduciary relationship between the grantor and a fiduciary, (2) that the fiduciary or an interest which he represented benefited from a transaction, and (3) that the fiduciary had an opportunity to influence the grantor's decision in that transaction.

3. DEEDS—UNDUE INFLUENCE—BURDEN OF PROOF.

The ultimate burden of proof in a suit to invalidate a deed as a product of undue influence does not shift; it remains with the plaintiff seeking to upset a deed throughout trial to persuade the trier of fact that undue influence was used to procure the deed.

4. DEEDS—UNDUE INFLUENCE—PRESUMPTIONS—BURDEN OF PERSUA-SION.

A plaintiff alleging that a deed was invalid as the product of undue influence may satisfy the burden of persuasion with the use of the presumption of undue influence, which remains as substantive evidence once the elements of the presumption have been proved, where the defendant fails to discharge his duty to produce sufficient rebuttal evidence to overcome the presumption.

5. DEEDS—UNDUE INFLUENCE—PRESUMPTIONS—BURDEN OF PERSUA-SION.

Plaintiffs alleging that a deed granted by their 72-year-old stepmother was the product of undue influence of the defendant-grantee, her second husband, failed to meet the burden of persuasion after proving facts that raised a presumption of undue influence where witnesses for both parties testified that the grantor was a strong-willed person who was mentally competent and capable of handling her own business affairs, and the defendant established that the grantor sought out and retained independent counsel, and that the grantor supplied the impetus behind the procurement of the deed.

6. TRIAL—DUE PROCESS—PREJUDICE.

The plaintiffs in a suit to invalidate a deed were not deprived of due process as they claim was demonstrated by a statement the trial court made at the close of the plaintiffs' case which purportedly showed that the court had decided the disposition of the case before hearing all the evidence where the court ruled in favor of the plaintiffs on an evidentiary issue and allowed them to reopen their proofs after he made the disputed statement, conducted the remainder of the trial without prejudice, weighed the facts and law, and delivered an 18-page written opinion in which he again ruled in the plaintiffs' favor on the evidentiary issue.

7. DEEDS—CONSIDERATION—SUFFICIENCY.

Lack of sufficient consideration is good cause to invalidate a deed in some cases, such as a case where creditors are defrauded; however, a deed granted by a wife to her husband was valid even in the absence of payment of the $1,000 consideration recited in the deed.

CONCURRING OPINION

KAVANAGH, C. J.

See headnotes 1, 2, 5, 6, and 7.

8. APPEAL AND ERROR—CASE PRECEDENT—DICTUM—BENCH TRIAL—JURY TRIAL.

*The only concern a reviewing court should have in a civil case which was tried before a judge is whether the reviewing court would reach a different result after an independent review of the entire record; it is not necessary or wise for the reviewing court to discuss a settled rule of evidence which is set forth in case law as it pertains to a case tried before a jury.*

DISSENTING OPINION

LEVIN, J.

9. EQUITY—ADVISORY JURY—FINDINGS OF FACT.

*A judge sitting in an equity case is aided but not controlled by the findings of an advisory jury on pure questions of fact.*

10. COURTS—GENERAL COURT RULES—EQUITY.

*The general court rules apply in equity as well as in actions at law (GCR 1963, 11, 12).*

11. APPEAL AND ERROR—FINDINGS OF FACT—BENCH TRIAL—CLEARLY ERRONEOUS.

The same reviewing standard for findings of fact—that they shall not be set aside unless "clearly erroneous"—applies to all actions tried without a jury or with an advisory jury, whether formerly cognizable as actions at law or in equity, whether civil or criminal (GCR 1963, 517.1).

12. APPEAL AND ERROR—FINDINGS OF FACT—BENCH TRIAL—CLEARLY ERRONEOUS—WORDS AND PHRASES.

A finding of fact made by a judge sitting in a bench trial is "clearly erroneous" where the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed; the judicial sieve with which the evidence is sifted on review of a nonjury case is of finer mesh than the one correspondingly employed on review of a jury's verdict (GCR 1963, 517.1).

13. APPEAL AND ERROR—DE NOVO REVIEW—TRIAL DE NOVO—WORDS AND PHRASES.

De novo review is distinguishable from a trial de novo where the evidence may be considered as if there had been no prior determination; de novo review meant in practice a review of limited scope without definite guidelines, as opposed to the current "clearly erroneous" standard on review which obliges the reviewing court to substitute its judgment on factual issues when convinced that a mistake in fact-finding was made.

14. DEEDS—UNDUE INFLUENCE—WORDS AND PHRASES.

Undue influence in obtaining consent to a deed may be exerted as an improper threat but more generally takes the form of unfair persuasion in the context of a relationship which is thereby abused; whether influence was undue depends upon the circumstances of the case, which makes any precise definition hazardous.

15. EQUITY—UNDUE INFLUENCE—ABUSE OF RELATIONSHIP—PRESUMPTIONS.

Implicit in a claim that the influence exerted in a transaction or disposition was undue is the assertion that a relationship was abused; as a matter of public policy the law generally allocates to the person asserted to have benefitted from a betrayal of a relationship the burden of producing evidence justifying his retention of the benefit.

16. DEEDS—UNDUE INFLUENCE—DONATIVE TRANSACTION.

A presumption that a deed was a product of undue influence may

arise in the familial context where the arrangement is attended by circumstances which call for an explanation, for example: the person apparently assenting was susceptible to improper persuasion, there was an opportunity to exert such pressure, the person benefitted indicated a disposition to take the initiative, the arrangement was unusual, it was clothed in secrecy, and the timing or other circumstances raise suspicion.

17. DEEDS—UNDUE INFLUENCE—DONATIVE TRANSACTION.

A presumption that a deed from a wife to her husband was a product of undue influence arose where: the wife's health was failing; there was evidence that her husband was disposed to exert pressure on his wife to make the deed and would have left the marriage if she did not convey the property to him; the conveyance disposed of her principal asset, resulted in the exclusion of her children from participation in her estate, and represented a sharp departure from her testamentary dispositions, which she did not change; the children were not advised of the conveyance until after the wife's death; and the disposition occurred nine months before her death.

18. EQUITY—UNDUE INFLUENCE—HUSBAND AND WIFE.

A threat of desertion of the marital relationship is the quintessence of undue influence in a disposition of property to the benefit of the spouse making the threat.

19. ATTORNEY AND CLIENT—PROFESSIONAL RESPONSIBILITY—WITNESSES —PENDING LITIGATION.

An attorney violates the Code of Professional Responsibility and Canons by accepting employment in pending litigation to cancel a conveyance between husband and wife as the product of undue influence knowing that as counselor, scrivener, and strawman in the conveyance, he would be called as a witness (Code of Professional Responsibility and Canons, DR 5-101[B]).

20. DEEDS—UNDUE INFLUENCE—HUSBAND AND WIFE.

Evidence that a wife who conveyed property to her husband was of sound mind, was of strong and determined will, was bright, and knew how to buy and sell is not inconsistent with her succumbing, at a time when her health was failing, to pressure from her husband which was abusive of the marital relationship to execute a conveyance to him to purchase peace.

*Komjathy & Komjathy* for plaintiffs.

*Alton P. Shirley (George Stone,* of counsel) for defendant.

Lindemer, J. This case involves an attempt to upset a deed between a woman and her husband on the ground that it was procured through undue influence.

Plaintiffs are the stepchildren of Julia Merkiel. Their natural mother, Helen Kar, died in 1914. In that same year Julia married John Kar, plaintiffs' father. She cared for his children as if they were her own. The property involved in this lawsuit, a farm near Belleville, Michigan, was purchased by John and Julia in 1917. John died in 1951, leaving Julia as the sole owner of the property. In 1953, Julia married Edward Merkiel. In 1969, by use of a "strawman", the property was deeded to Julia and Edward as tenants by the entireties. When Julia died in 1970, Edward became the sole owner of the property. On March 25, 1970, plaintiffs filed this lawsuit against Edward hoping to have the 1969 deed invalidated. If the deed were to be voided, the property in dispute would pass by the terms of Julia's will. Under her will, plaintiffs would receive approximately two-thirds of the land while the remainder of the property would go to Edward. Edward died on September 18, 1971, and Fred Hogan, executor of his estate, was substituted as defendant.

Trial commenced on July 6, 1972, before Wayne Circuit Court Judge George E. Bowles. Apparently there was a dispute over whether or not the parties were entitled to have a jury trial. The judge postponed decision of this question until after trial. A jury was selected and the trial proceeded as a regular jury trial. At the conclusion of the trial, the judge requested briefs from both parties on this issue. In his written opinion Judge Bowles

concluded that there was no right to a jury trial of this case and therefore " * * * the verdict of the advisory jury is mere surplusage without legal effect".

In spite of a jury verdict in favor of plaintiffs, the trial judge decided the case for defendant. The Court of Appeals affirmed. *Kar v Hogan,* 54 Mich App 664; 221 NW2d 417 (1974). This Court granted plaintiffs' application for leave to appeal on December 5, 1974. 393 Mich 766 (1974). We affirm.

Plaintiffs raise three issues for review. Their first argument is that on the basis of the evidence presented, the trial judge should have found the deed to be the product of undue influence. To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient. *Nelson v Wiggins,* 172 Mich 191; 137 NW 623 (1912). However, in some transactions the law presumes undue influence. The presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction.

The trial judge found all the necessary elements and applied the presumption to the case. It is the application of the presumption and its effect upon the "burden of proof" over which the parties are

split. Plaintiffs argue that, once established, the presumption shifts the burden of proof to the defendant to show an absence of undue influence.

The seeds of this argument were sown by Justice Souris in his landmark opinion of *In re Wood Estate,* 374 Mich 278; 132 NW2d 35; 5 ALR3d 1 (1965). Several law review comments concerning *Wood* have aided this theory to sprout roots. Callahan, *Succession and Trusts,* 17 Wayne L Rev 665, 671 (1971); *Recent Decisions,* 40 Notre Dame Lawyer 676, 677 (1965). Recently, the Court of Appeals has been nurturing this theory towards full bloom. *Totorean v Samuels,* 52 Mich App 14, 21; 216 NW2d 429 (1974); *First National Bank & Trust Co of Marquette v Albert,* 66 Mich App 252; 238 NW2d 827 (1975). In *Totorean,* the Court of Appeals said:

"We read *Wood* as standing for the proposition that a rebuttable presumption shifts the burden of proof. In dicta the *Wood* Court said:

" 'Finally, in every case in which evidence has been offered to rebut presumed fact C, the jury should be instructed that in the event it cannot decide upon which side the evidence preponderates, then as a matter of law fact C must be presumed.' *In re Wood, supra,* 295; 132 NW2d 46.

"Therefore, in those cases where (1) plaintiff has the benefit of a presumption which has been rebutted and, thus, reduced to a permissible inference; and (2) the trier of fact determines the evidence of plaintiff and defendant to be equal, the trier of fact should return a verdict for the plaintiff. This can only mean the ultimate burden of proof is on defendant—not plaintiff." (Footnote deleted.)

We disagree. The ultimate burden of proof in undue influence cases does not shift; it remains with the plaintiff throughout trial. We readily

concede that prior cases may have unnecessarily confused the issue. In the case of *In re Bailey's Estate,* 186 Mich 677, 692; 153 NW 39 (1915), this Court held:

"It is true that a presumption is raised that calls for an explanation, but the burden of proof to show undue influence is not thereby shifted."

But only two years later in *Williams v Williams,* 198 Mich 1, 4–5; 164 NW 374 (1917), the Court said:

"That the presumptions are against transactions of this nature and they are critically scrutinized by the courts, putting the burden of proof upon those seeking to sustain them, requires no citation of authority."

The essence of the problem is the definition of "burden of proof". There are two separate meanings. 9 Wigmore, Evidence (3d ed), § 2483 *et seq.,* p 266 *et seq.;* McCormick, Evidence (2d ed), § 336, p 783; James, *Burdens of Proof,* 47 Va L Rev 51 (1961). One of these meanings is the *burden of persuasion* or the *risk of nonpersuasion.* The other is the *burden of going forward* or the *risk of nonproduction.*

Generally the burden of persuasion is allocated between the parties on the basis of the pleadings. The party alleging a fact to be true should suffer the consequences of a failure to prove the truth of that allegation. A plaintiff has the burden of proof (risk of nonpersuasion) for all elements necessary to establish the case. This burden never shifts during trial. Therefore, plaintiffs, who alleged the existence of undue influence, bore the ultimate burden of persuading the trier of fact that undue influence was used to procure the deed.

Initially, the burden of going forward with evidence (the risk of nonproduction) is upon the party charged with the burden of persuasion. However, the burden of going forward may be shifted to the opposing party.

"We have seen something of the mechanics of the process of 'proceeding' or 'going forward' with evidence, viewed from the point of view of the *first* party who is stimulated to produce proof under threat of a ruling foreclosing a finding in his favor. He may in respect to a particular issue pass through three states of judicial hospitality: (a) where if he stops he will be thrown out of court; (b) where if he stops and his adversary does nothing, his reception will be left to the jury; and (c) where if he stops and his adversary does nothing, his victory (so far as it depends on having the inference he desires drawn) is at once proclaimed. Whenever the first producer has presented evidence sufficient to get him to the third stage and the burden of producing evidence can truly be said to have shifted, his adversary may in turn pass through the same three stages. His evidence again may be (a) insufficient to warrant a finding in his favor, (b) sufficient to warrant a finding, or (c) irresistible, if unrebutted." McCormick, *supra,* p 793.

A discussion of presumptions and their effect upon the burden of producing evidence appears in *Wood.*

"Presumptions in the law are almost invariably crystallized inferences of fact. Experience has taught that if certain evidentiary facts be established, there is such a strong practical likelihood that another stated fact will be true that that fact may be presumed. The law's special recognition of this lesson of experience is expressed by its rulings that if a litigant proves evidentiary facts A and B, then fact C's existence will be presumed.

"The immediate legal effect of a presumption is procedural—it shifts the burden of going forward with the

evidence relating to the presumed fact.[5] Once there is a presumption that fact C is true, the opposing party must produce evidence tending to disprove either facts A and B or presumed fact C; if he fails to do so, he risks jury instruction that they must presume fact C to have been established."

[5] *Baker v Delano*, 191 Mich 204, 208 [157 NW 427 (1916)], citing 1 Elliott on Evidence § 91: ' "The office or effect of a true presumption is to cast upon the party against whom it works the duty of going forward with evidence." ' " *Wood, supra*, p 288–289.

The thrust of the *Wood* case was to change the law in this state concerning the effect that a presumption has *after* rebuttal evidence has been introduced. Prior to *Wood*, Michigan held to the "Thayer" or "bubble bursting" approach; that is, the presumption governed only the burden of going forward with evidence and the presumption was totally dissipated if rebuttal evidence was offered. See *In re Haskell's Estate*, 283 Mich 513; 278 NW 668 (1938). *Wood* rejected the "Thayer" approach and adopted the view that once rebuttal evidence was introduced, the presumption, originally a "mandatory inference", was reduced to a "permissible inference". Unless the defendants' controverting evidence met the standard for a directed verdict, the presumption, as a "permissible inference", was sufficient to get the case before the jury. *Wood, supra*, 290–291.

The passage from the *Wood* case cited by the Court of Appeals in *Totorean, supra,* as authority for the position that the burden of persuasion shifted to the defendants upon proof of the presumption was gratuitous language. The Court of Appeals recognized it as dictum but relied upon it anyway. We have examined both the majority and the dissenting opinions in *Wood* and we are convinced that the Court had no intention of adopting the theory advanced by plaintiffs here and the

Court of Appeals in *Totorean.* We believe the
dictum from *Wood* refers to the burden of going
forward with evidence that the transaction was
free of undue influence. If the trier of fact finds
the evidence by the defendant as rebuttal to be
equally opposed by the presumption, then the
defendant has failed to discharge his duty of pro-
ducing sufficient rebuttal evidence and the "man-
datory inference" remains unscathed. This does
not mean that the ultimate burden of proof has
shifted from plaintiff to defendant, but rather that
plaintiff may satisfy the burden of persuasion with
the use of the presumption, which remains as
substantive evidence, and that the plaintiff will
always satisfy the burden of persuasion when the
defendant fails to offer sufficient rebuttal evidence.

In the case at bar, the trial judge reviewed the
proofs and found the presumption to have been
rebutted. We agree. The facts disclosed that at the
time the disputed deed was signed, Julia Merkiel
was 72 years old and suffering from a decline in
her physical condition. She had trouble walking
and needed assistance to do so. She had been
hospitalized three times in the two years before
her death in 1970. However, both plaintiffs' and
defendant's witnesses testified that Julia was a
strong-willed individual who was mentally compe-
tent and capable of handling her own business
affairs. Julia was a native Hungarian who emi-
grated to this country at an early age. Apparently
she had no formal education but she was capable
of both reading and conversing in the English
language.

In 1966, Julia first approached Fred Hogan and
requested that he draft her will. Subsequent to
that event, Julia returned to attorney Hogan's
office and requested that he prepare a purchase
agreement for the sale of the farm. On another

occasion, Julia requested that Hogan prepare a deed to the property upon which the Kar Bottling Works Company was located. The deed was from Julia to plaintiff Edward W. Kar. Finally in May of 1969, Julia approached Hogan with a request to draft the deed which is challenged in this lawsuit. Hogan testified that he thoroughly discussed the transaction with his client:

"We again discussed the ramifications of preparing such a deed, that it [the deed] would it [the farm] take *[sic]* out of the estate and it would then go to the survivor, either her if she survived Ed Merkiel or Ed Merkiel if he survived her. She advised me that this is what she wanted to do. I prepared a deed and she came back at a later date and signed the deed."

Hogan also testified that:

"Whenever any business was transacted in the office Julia did all the talking and all the negotiations. Ed on —on occasion, when he would come with her, he would sit in a chair and Julia did all the talking."

Finally Hogan testified that his observations led him to believe that Julia was acting in accordance with her own will and not subjected to undue influence.

It is true that the record contains contrary evidence. There were occasional statements by Julia to her stepchildren and to her neighbor that the plaintiffs were to inherit the land. Some letters from Edward Merkiel to plaintiffs were introduced into evidence and considered by the trial judge.

On this record we conclude that defendant met his burden of rebutting the presumption of undue influence. The defense evidence established that Julia sought out and retained independent counsel

and that she supplied the impetus behind the procurement of the deed. We believe that plaintiffs failed to meet their burden of persuasion on the issue of undue influence.

Plaintiffs' second issue alleges that the trial judge committed reversible error in declaring his decision as to the disposition of the case before hearing all of the evidence. Plaintiffs offer the following unsolicited statement of the trial judge to support their allegation.

"I want to be frank with able counsel. If I was deciding this non-jury, I would have no difficulty with it at all. I would hold for the defendant. I think all plaintiffs have shown was that *[sic]* the many, many plaintiffs have shown, namely, the opportunity of undue influence because this disposition of property was different from what the plaintiffs thought it was going to be. That doesn't make out a case of undue influence; it is an opportunity for undue influence. There is not one scintilla of evidence in this case. As a matter of fact, it is all to the contrary. She got sick, but to get sick, is I think to dispose of one's state *[sic]*—most of us will never get to dispose of our estates—many of these are disposed of while they are thinking, you know, what is going to happen to it when we are sick. I am going to be very frank with counsel. To me there isn't even a prima facie case made out by the plaintiff. It is quite a different thing when you have the free jury situation. I think a jury case has been made out and the only question is in my mind is whether there is a jury case both as to the confidential fiduciary relationship and the undue influence. I have to say that because of the nature of the relationship, namely, husband and wife, that in and of itself is a fiduciary relationship and therefore it would go to the jury merely on undue influence."

We agree that the above passage is ambiguous and confusing. The trial judge made this statement at

the close of plaintiffs' proofs. The record discloses
that shortly after this statement was made, the
trial judge ruled in favor of plaintiffs on an issue
concerning the dead man's statute and allowed
plaintiffs to reopen their proofs in order to adduce
further testimony. We find no prejudice in the way
the trial judge conducted the remainder of the
trial, including the defense proofs, the final argu-
ments by the attorneys and the instructions to the
jury. Neither party seemed reversibly limited in
presentation of its case. We agree with plaintiffs
that due process requires that litigants have their
cases heard in full before an impartial decision
maker. *People v Thomas,* 390 Mich 93; 210 NW2d
776 (1973); *Wayne County Prosecutor v Doerfler,*
14 Mich App 428; 165 NW2d 648 (1968). However,
we cannot say, as we did in *Thomas,* that plaintiffs
in this case were deprived of due process because
they were not afforded a meaningful opportunity
to present their case. Judge Bowles weighed facts
and law carefully and delivered an 18-page written
opinion. In that opinion he again ruled in favor of
plaintiffs on the issue of admission of the letter
exhibit 11c. We find no merit in plaintiffs' argu-
ment on this issue.

Plaintiffs' final issue concerns whether or not
the deed was void because it was not based upon
sufficient and valid consideration. At 'trial, attor-
ney Hogan testified that the $1,000 consideration
recited in the challenged deeds was, in fact, never
paid. Plaintiffs argue that this is a failure of
consideration and that the deeds are void. While
we agree that in some cases the lack of sufficient
consideration is good cause to invalidate a deed,
such as the case where creditors are defrauded,
the deed between Julia and Edward was valid even
in the absence of consideration. *Straith v Straith,*

355 Mich 267; 93 NW2d 893 (1959). We find no error in this issue.

As we hear chancery cases *de novo,* it is our duty to examine the entire record and weigh all the evidence presented. *Hawthorne v Dunn,* 210 Mich 176; 177 NW 393 (1920). Our review of this record leads us to conclude that the trial judge properly decided this case in favor of defendant. Affirmed, costs to defendant.

Williams, Coleman, and Fitzgerald, JJ., concurred with Lindemer, J.

Ryan, J., took no part in the decision of this case.

Kavanagh, C. J., *(concurring).* I agree with my Brother Lindemer that the trial judge did not commit reversible error by his statements at the close of plaintiffs' proofs and that the absence of consideration did not invalidate the conveyance.

I also agree that plaintiffs failed to meet their burden of proof on the question of undue influence. I write separately because I do not think it necessary nor wise for the Court to discuss in this case the evidentiary effect to be given a presumption once contradictory evidence has been introduced. The settled law in Michigan on this question, as it pertains to a jury trial, is set forth in *In re Wood Estate,* 374 Mich 278; 132 NW2d 35 (1965).

The only concern this reviewing Court should have in this judge-tried case is whether we would reach a different result after an independent review of the entire record. I would not, and therefore I concur in affirmance.

Levin, J. *(dissenting).* The issue is whether a

conveyance of a farm should be set aside on account of undue influence.

Plaintiffs Edward W. Kar and Irene Altshuler are the surviving children of John and Helen Kar. Helen died in 1914 when Edward was two and Irene six.

John married Julia soon thereafter. They had no children, and she reared Edward and Irene as her children.

The farm was purchased by John and Julia as tenants by the entireties in 1917. John died in 1951 at 68. Julia was 56. The farm was fully paid for.

A little over a year later Julia married Edward Merkiel, a retired municipal employee. They lived on the farm. Julia died 17 years later, February 18, 1970. Merkiel died a year and a half after Julia, September 18, 1971.

Nine months before her death, May 20, 1969, Julia conveyed the farm through strawmen (Fred H. Hogan, her attorney, and his wife) to herself and Merkiel, as tenants by the entireties. This action challenges that conveyance.

Julia's 1957 will would have left Merkiel a life estate in the farm, the remainder to be divided equally between the children; sale of the farm was permitted, the proceeds to be divided one-third each to Merkiel and the two children. She revised her will in 1966; the northwest 40 acres of the farm, where the buildings were situated, and all her personal property were left to Merkiel, and the remaining 100 acres were to be sold and the proceeds divided equally between "my children". There is no later will.

The children's only expectancy in Julia's estate under the 1966 will was in the remaining 100 acres. Since Julia predeceased Merkiel, the effect

of the 1969 conveyance creating the entireties estate was to deprive Edward and Irene of any inheritance upon Julia's death. Edward and Irene commenced this action on March 25, 1970 against Merkiel to set aside the May, 1969 conveyance.

Hogan entered an appearance for Merkiel and filed an answer denying plaintiffs' allegations and asserting that Julia was in possession of all her faculties and was of sound mind at the time of the conveyance and was not acting under duress or undue influence. Hogan continued to represent the defendant for nearly two years until, as executor of Merkiel's estate, he was substituted as the defendant and another lawyer was substituted as attorney for defendant.

At the time of trial in 1973 the market value of the farm was approximately $300,000.

Hogan testified that he first met Julia and Merkiel in 1966 when he drew Julia's will. He later represented her in real estate transactions. The challenged deed was prepared when Julia asked Hogan to make the farm "joint between her and Ed Merkiel". Hogan "discussed the ramifications of preparing such a deed, that it would take [the farm] out of the estate and it would then go to the survivor". "She advised me that this was what she wanted to do."[1] Hogan described her as alert, lucid and strong willed; Merkiel, who drove Julia to Hogan's office, "would sit in the chair and Julia did all the talking". She signed the deed "willingly" and "not grudgingly". "I would say she knew what she was doing and I did exactly what

---

[1] Hogan amplified:

"I explained it to Julia this way: If she died before Ed died, Ed would own the property; if he died before she died, she would own all the property and that was a tenancy by the entireties that would pass from one to the other depending on who died first without having to be probated in probate court."

she asked me to do." On February 1, 1970, shortly before Julia's death, Hogan prepared a will for Merkiel.

Edward testified that after his father's death he continued to visit his mother[2] every week or ten days until her death. She was a person of strong and determined will.

Irene testified that after her father's death she and her husband lived at the farm until her mother married Merkiel. During the last two years of her life her mother was in the hospital three or four times for periods of two weeks or longer; Irene said she visited her almost every day. In December, 1969, her mother said she knew she was dying and asked Irene to take care of Merkiel, "to take care of the farm until he dies and you children take it" and said this many times. In response to questions from the judge, Irene said that her mother was not mentally incompetent at any time. She was bright and knew how to buy and sell. At one point in the relationship Merkiel "threatened to divorce her, or he left her a couple of times". "[I]t wasn't a happy marriage."

A neighbor who had purchased part of the farm in 1965 and who saw Julia almost every day testified that Julia would frequently say " 'Well, this property is going to my Eddie, to my children,' and she would cry". "That happened every week, every week we would go out [for a drive], in fact." Such expressions continued through November, 1969. The neighbor also said, "I wondered why she said it didn't belong to her. I always thought the property was not in his name."

After Julia's death Merkiel offered to convey to

[2] As indicated in Julia's wills, she referred to Edward and Irene as her children. They referred to her in their testimony as their mother. Hogan, who drew the 1966 will, said he was unaware that Edward and Irene were step-children until after Julia's death.

Irene 17 wooded acres which, she testified, her
father always wanted her to keep, but no convey-
ance was executed.

The controversy was tried to an advisory jury
which rendered a verdict "find[ing] in favor of the
plaintiffs, the deed is cancelled". In an equity case,
however, the judge is "aided but not controlled by
the findings of a jury on pure questions of fact".[3]
The judge subsequently rendered his opinion, find-
ing for Merkiel's estate. In so ruling, the judge
declared that he had considered a letter dated
May 3, 1970 (six weeks after the commencement of
this action) from Merkiel to Edward, not admitted
at the jury trial:

"There is another thing Eddie that you did not know
about and that's the agreement your mother and I
entered into before we ever got married. I told her very
clearly and distinctly that things would have to be so &
so before I ventured into any kind of marriage. She also
told me how it would be worth while for me to get
united in matrimony with her. I admit your mother
waited a long, long time before she fully lived up to our
agreement (because, she very much had a mind of her
own). *I admit that if she hadn't come to my terms I
would have bowed out of the picture.* And believe me
Eddie I would never, never want to go thru the same
thing even if someone would offer me 20 farms like the
one I am living on now. So figure out yourself, what is
'paltry 100 acres' for what I had gone thru. *Lord* only
knows the whole story. But the Lord also knows that I
will pray for your mother as long as there is breath left
in me.

"So in conclusion I will say that children should not
depend on their parents for livelihood, for assets, stocks
or anything along that line. Property or anything they
own is their whole possession and not their childrens
even if they help and there is no Civil law, God's law or

---

[3] *Leser v Smith,* 212 Mich 558, 561; 180 NW 464 (1920); *Abner A
Wolf, Inc v Walch,* 385 Mich 253, 260; 188 NW2d 544 (1971).

conscience law that they can't do what they want with
it and if they don't leave it for you thru a 'Will' or some
sort of an agreement then it just doesn't belong to you.
That's the whole thing in a nut shell.

"What I might do, like·I was thinking all week, is to
*give* you a portion. Why? It would be purely a good
gesture, but no other reason." *(Lord* and *give* empha-
sized in original; other emphasis added.)

The judge said that the letter indicated "persua-
sion or influence, but it is not undue influence".

The Court of Appeals affirmed, stating that it
reviews chancery cases *de novo,* and reverses only
if on examination of the record it concludes that it
would "[b]e *required* to reach a different result had
we been in the chancellor's position". "A careful
review of the record reveals a trial of confused
facts but does not convince us that we would have
been *required* to reach a different result" (empha-
sis added).

This Court states that it reviews chancery cases
*de novo* and that on review of the record it con-
cludes that the "trial judge *properly* decided this
case in favor of defendants" (emphasis added).

I

The court rules apply in equity as well as law
actions:

"These rules govern the practice in the circuit courts,
* * * in actions of a civil nature whether heretofore
cognizable as actions at law or in equity. * * * " GCR
1963, 11.
"There shall be 1 form of action to be known as a
'Civil Action.' " GCR 1963, 12.

The court rule, "Findings by the Court," applica-
ble by its terms "[i]n all actions tried upon the

facts without a jury or with an advisory jury", states the appellate reviewing standard:

"Findings of fact shall not be set aside unless *clearly erroneous.* In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appeared before it." GCR 1963, 517.1 (emphasis added).

Plainly the same reviewing standard—the "clearly erroneous" standard—applies in all actions tried without a jury or with an advisory jury, whether formerly cognizable as actions at law or in equity, whether civil or criminal.[4]

"It should be emphasized that the standards for reviewing findings by the court, as set forth in Rule 517, apply in all civil actions tried upon the facts without a jury, including law cases tried without a jury *and equity actions* tried by the court or with an advisory jury." 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Author's Comments accompanying Rule 517, p 595 (emphasis added).[5]

The "clearly erroneous" standard is derived from FR Civ P 52(a). This Court recently adopted the Federal construction of that language: a finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed", and said: "Appropriately, the 'judicial sieve' with which we have sifted the evidence in this

---

[4] *See People v Jackson,* 390 Mich 621, 627; 212 NW2d 918 (1973).

[5] The commentary continues:

"Rule 517 prescribes a single standard of review for court findings in all actions, legal or equitable, tried without a jury. The standard is essentially that of the former equity practice. The standard is that findings of fact shall not be set aside unless 'clearly erroneous.'" 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Authors' Comments accompanying Rule 517, p 596.

nonjury case is 'of finer mesh than the one corre-
spondingly employed on review' of a jury's ver-
dict." *Tuttle v Department of State Highways,* 397
Mich 44, 46; 243 NW2d 244 (1976).[6]

The Court's conclusion that the trial judge
"properly decided this case in favor of defendant"
is preceded by a reference to a 1920 case to sup-
port the statement that chancery cases are re-
viewed *de novo.*

*De novo* review is distinguishable from a trial *de
novo,* where the evidence may be considered as if
there had been no prior determination.[7] *De novo*
review meant in practice a review of limited scope
without definite guidelines.[8] The "clearly erro-
neous" standard requires a searching examination
of the record, and is directed by a purposeful
guideline which obliges the reviewing court to

---

[6] *Similarly, see Hi-Way Motor Co v International Harvester Co,* 398
Mich 330, 339; 247 NW2d 813 (1976):

"Although we are hesitant to disturb the trial judge's findings, we
find that they are within the 'clearly erroneous' language of GCR
1963, 517.1. The 'judicial sieve' employed here is appropriately 'of
finer mesh than the one correspondingly employed here on review' of
a jury's verdict. *Schneider v Pomerville,* 348 Mich 49, 54–55; 81
NW2d 405 (1957)."

[7] *Cf.* 2 Am Jur 2d, Administrative Law, § 698, p 597.

[8] "Formerly in chancery cases, although it was commonly said that
issues of fact were tried *de novo* on appeal or that the Supreme Court
must weigh the evidence and reach an independent conclusion on
review of the facts, this did not mean that the findings of the trial
judge were entitled to no consideration. Notwithstanding the right
and duty of the Supreme Court to make its independent evaluation of
the evidence, it would not set aside the findings of the trial judge
unless it was convinced that a clear showing of error had been made.
Running through the opinions are phrases such as 'clear error,'
'manifest error,' 'palpably erroneous.' See M.L.P. Appeal § 382 and
Michigan Decisions, *infra.* Especially when there was a sharp conflict
in the evidence, the reviewing court would not disturb the trial
court's determination of fact questions, unless it was clear that a
wrong conclusion had been reached. The Supreme Court *was most
reluctant* to disturb the findings of a trial judge based on credibility,
since the trial judge, as the trier of facts, had the advantage of
observing the witnesses. *Ibid."* 2 Honigman & Hawkins, *supra* (em-
phasis added).

substitute its judgment on factual issues when convinced that a mistake in fact-finding was made.

The opinion of the Court does not advert to the currently applicable "clearly erroneous" reviewing standard. This suggests that the Court, with undue deference to the judge's findings, may not have employed the "finer mesh" in this case.

## II

The doctrines of duress and undue influence are concerned with wrongful means of obtaining apparent consent.

There is overlap between the behavior characterized in law as duress and as undue influence. While duress may be exerted by physical compulsion it is generally applied by a wrongful or improper threat. Undue influence may also be exerted by an improper threat but more generally takes the form of unfair persuasion in the context of a relationship which is thereby abused. Influence thus becomes undue as a function of the relationship, while duress is improper without regard to relationship.

Various definitions of undue influence have been offered.[9] Briefly, undue influence is persuasion that abuses a relationship.

---

[9] "[I]t must appear that the free agency of the person influenced was taken from him or destroyed, and in its place the will of another person substituted." 25 Am Jur 2d, Duress and Undue Influence, § 36, pp 396–397 (footnotes omitted).

"To establish undue influence, it must be made of threats, or misrepresentation, or undue flattery, or fraud practiced, or physical or *moral coercion* sufficient to overpower volition, destroy free agency, and impel the party upon whom it is practiced to act against his inclination and will." *Nelson v Wiggins,* 172 Mich 191, 199–200; 137 NW 623 (1912) (emphasis added). *Similarly, see In re Kramer's Estate,* 324 Mich 626, 635–636; 37 NW2d 564 (1949).

"Undue influence consists in persuasion carried to the point of overpowering the will, or such a control over the person in question as prevents him from acting intelligently, understandingly, and voluntarily, and in effect destroys his free agency and *constrains* him to

The determination whether influence was undue, and the challenged arrangement was thereby effected, "depends upon the circumstances of the particular case, which makes any precise definition hazardous".[10] " 'Undue influence,' like 'due process of law,' is an expression having little meaning apart from its application in the many litigated fact situations."[11]

The burden of proving undue influence is on the person who asserts it; a prima facie case is often made, however, by showing a relationship or circumstances that give rise to a presumption of undue influence.

The judge declared that a presumption of undue influence arose in this case, and this appeal has been reviewed on that premise. I agree that such a presumption arose, not because Julia and Merkiel were husband and wife[12] or because marriage is a relationship of trust and confidence or because it is

do that which he would not have done if such control had not been exercised. It is any influence, however exercised, which destroys free agency, and substitutes the will of another for that of the person in whose name the act brought in judgment is done." 2 Black, Rescission & Cancellation (2d ed), § 237, pp 676–677 (footnotes omitted) (emphasis added).

"Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by *unfair persuasion* of the latter, is induced by undue influence and is voidable." 2 Restatement, Contracts, § 497, p 954 (emphasis added).

"The confidence moving from one party places the other party in a position of dominance and influence analogous to a confidential or fiduciary relationship. *It is not the existence of this relationship which is undue influence, but its misuse.*" 13 Williston, Contracts (3d ed), § 1625, p 777 (footnotes omitted) (emphasis added).

[10] 25 Am Jur 2d, *supra,* § 35, p 395.

[11] Note, *Undue Influence in Intervivos Transactions,* 41 Colum L Rev 707, 708 (1941).

[12] *See* 3 Pomeroy, Equity Jurisprudence (5th ed), § 962c, p 856; 2 Black, *supra,* § 251, pp 709–710; 41 Am Jur 2d, Husband and Wife, § 274, pp 226–227.

assumed that the husband is dominant, but because the circumstances of this case suggest that undue influence may have been exerted.

The law creates presumptions to serve various ends.[13] Implicit in a claim that influence exerted was undue is the assertion that a relationship was abused; as a matter of public policy the law commonly allocates to a person asserted to have benefitted from betrayal of a relationship the burden of producing evidence justifying his retention of the benefit.

It is frequently said, therefore, that a presumption of undue influence arises where the person benefitted is in a fiduciary, confidential or quasi-confidential relationship, *e.g.,* a trustee, attorney, physician, clergyman or business adviser.[14]

On the premise that the family relationships of husband-wife and parent-child are based similarly on trust and confidence, such a presumption has also been said to arise where intra-family transactions or dispositions are challenged.[15] Intra-family transactions and dispositions are, however, so commonplace, prompted generally by affection, kindness and other proper considerations, that unattended by other circumstances they call for no explanation. It would be disproportionate to cast the burden of producing countervailing evidence on the person benefitted in often prosaic family transactions without regard to the occasion or the proportion or the amount involved or to other circumstances.[16]

---

[13] *See* Morgan, Basic Problems of Evidence, p 32 *et seq.;* 1 Weinstein's Evidence, ¶ 300[02], p 300-7; McCormick, Evidence (2d ed), § 343, p 806.

[14] *See* 25 Am Jur 2d, *supra,* § 38, pp 399–400; 2 Black, *supra,* § 249, p 704; 13 Williston, *supra,* § 1625, pp 776–784.

[15] *See* 13 Williston, *supra,* §§ 1626, 1626A, pp 800–804; *Peyton v William C Peyton Corp,* 23 Del Ch 321; 7 A2d 737 (1939); Note, *supra,* 41 Colum L Rev, p 713; 59 Am Jur 2d, Parent & Child, § 144, p 244.

[16] *See Pritchard v Hutton,* 187 Mich 346, 357; 153 NW 705 (1915);

In the familial context, a presumption of undue influence may arise where the challenged arrangement is attended by circumstances which call for an explanation.[17] Among the circumstances often present when such a presumption is said to arise[18] are: the person apparently assenting was susceptible to improper persuasion, there was opportunity to exert such pressure,[19] the person benefitted indicated an inclination to take the initiative, the arrangement was unusual, it was clothed in secrecy, and the timing or other circumstances raise suspicion.

These factors were, in combination, present in this case:

—While Julia's mind was good and she was strong willed and determined, her health was failing; she was susceptible to improper persuasion.

—Julia and Merkiel were living together; there was opportunity to exert such pressure.

_Harper v Robinson_, 275 Mich 623, 625; 267 NW 575 (1936); _Tapin v Kramer_, 238 Mich 497, 507; 213 NW 699 (1927); _In re Jackson's Estate_, 220 Mich 565, 573; 190 NW 762 (1922).

[17] See _Harper v Robinson, supra; Smith v Cuddy_, 96 Mich 562, 568; 56 NW 89 (1893); 3 Pomeroy, _supra_, § 962c, p 856; _see also Guinon v Guinon_, 184 Mich 56, 60; 150 NW 311 (1915); _Hemphill v Holford_, 88 Mich 293, 297–298; 50 NW 300 (1891); _Stiles v Stiles_, 14 Mich 72, 75–76 (1866).

"The rule most consonant with reason would seem to be, not that there is always a presumption of undue parental influence in every case of conveyance from a child to parent, or that there is always a presumption of validity in such a case, but rather that courts of equity, in examining such transaction, will carefully search for suspicious circumstances having a tendency to show unfairness or undue influence, and, in case any such circumstances are found, will require the party claiming the benefit of the contract to clear the transaction of any such cloud." Anno: _Fraud or undue influence in conveyance from child to parent_, 11 ALR 735, 746.

[18] See _Seeley v Price_, 14 Mich 541, 547 (1866); _Duncombe v Richards_, 46 Mich 166, 169; 9 NW 149 (1881); _Connor v Harris_, 258 Mich 670, 677; 242 NW 804 (1932); Note, _supra_, 41 Colum L Rev, pp 717–723.

[19] Since family members are often together this factor, although mentioned in the cases, is not of much significance.

—Merkiel's letter of May 3, 1970 and other correspondence with the children following Julia's death indicate that he strongly desired the entire farm and had made his wishes known to Julia; there is indication he took the initiative.

—The conveyance involved Julia's principal asset and resulted in the exclusion of the children from participation in her estate, representing a sharp departure from her testamentary dispositions which she did not revise; the arrangement was unusual.

—The execution of the conveyance was not communicated to the children until after Julia's death; there was secrecy.

—The conveyance, nine months before Julia's death, occurred at a time when her demise might have been thought imminent; the timing is suspicious.

For the reasons stated, a presumption arose that the conveyance creating the entireties estate was the result of the exertion of influence that was undue, of persuasion that was unfair, of abuse of the relationship of mutual trust and confidence implicit in marriage.

The inference of undue influence established by the presumption is, we all agree, substantive evidence. In the absence of rebuttal evidence the inference is mandatory. If there was rebuttal evidence, the inference is downgraded from a mandatory to a permissible inference.[20]

[20] Unless the rebuttal evidence is so compelling that all reasonable men would agree the inference has been overcome, a verdict for the defendant may not be directed even though plaintiff offers no direct evidence other than the evidence which gives rise to the presumption. *See In re Wood Estate,* 374 Mich 278; 132 NW2d 35 (1965).

MRE 301, proposed rules of evidence, following FR Ev 301, states:

"In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to

## III

There was, apart from the inference arising from the presumption of undue influence, direct and compelling evidence of undue influence.

Merkiel's statement in his letter of May 3, 1970, "I admit that if she hadn't come to my terms I would have bowed out of the picture," evidences unfair persuasion and hence undue influence. As stated in an illustration to the Restatement of Contracts:

"A induces his wife, B, to enter into a contract by representing that otherwise he will desert her. There is undue influence." 2 Restatement, Contracts, § 497, p 955.[21]

A threat of desertion is the quintessence of undue influence.[22]

## IV

The countervailing evidence is insubstantial, and is unresponsive to the presumptive inference and to the evidence that the conveyance was the result of influence that was undue and that abused the marital relationship.

It is sometimes said that an inference or evidence of undue influence may be negatived by evidence that the purported consent was given on

rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was origi-nally cast."

[21] A resumption of a marital relationship after a "justified" separa-tion is lawful consideration supportive of an agreement or transac-tion. 6A Corbin on Contracts, § 1474, p 618.

There is no finding, or evidence to support a finding, that Merkiel would have been justified in deserting Julia.

[22] It may, of course, be shown in rebuttal that such a statement was not regarded as a threat and did not induce the arrangement. *See* 2 Black, *supra*, § 242, pp 687–688.

independent advice.[23] Such advice regarding the
terms of a business transaction might have signifi-
cance but is of little value and merely window
dressing when the person giving the advice is
unaware of the pressure or in no position to re-
lieve it. A business counsellor or lawyer might
advise regarding the adequacy or propriety of the
consideration or suggest more advantageous alter-
natives; however, it was not business or legal
acumen or advice, but a psychiatrist's perception,
a physician's intuition, and a marriage counsellor's
or clergyman's understanding that were here re-
quired.

Hogan's testimony about his advice regarding
the conveyance tends to negative only a misunder-
standing on Julia's part of the legal significance of
what she was doing. His legal advice would not
have relieved the pressure apparently confronting
her at a time when, although she was alert and
lucid, her health was failing.

While Hogan said that Julia signed the deed
"willingly" and "not grudgingly", he did not indi-
cate that he made inquiry whether she had been
subjected to pressure or over-persuasion; Merkiel's
presence suggests that he did not. Even if he did,
there was no reason for Julia to confide in him
regarding her marital relationship—especially in
Merkiel's presence—or reason to believe that if
she had he could have done anything to resolve
the apparent pressure other than to satisfy Mer-
kiel's demands by preparing the deed.

Moreover, there is no reason to give particular
credence to Hogan's testimony that he counseled
her in the manner he claimed. As executor of
Merkiel's estate he was an interested witness.[24] He
had violated the Code of Professional Responsibil-

[23] *See* 25 Am Jur 2d, *supra,* § 46, p 406; 13 Williston, *supra,* § 1625,
p 778; 2 Black, *supra,* § 244, p 693.

ity and Canons by accepting employment in pending litigation knowing that, as counselor, scrivener and strawman in the conveyance, he would be called as a witness.[25] He continued to represent the interests of the defendant for nearly two years until, on February 3, 1972, another attorney was substituted.

The evidence that Julia was of sound mind, was of strong and determined will, was bright, and knew how to buy and sell is not inconsistent with her having succumbed, at a time when her health was failing, to pressure from the man with whom she lived, and does not rebut the inference and direct evidence of undue influence. Many people can cope with almost anything but pressure at home.

Mental incapacity—a separate ground for avoiding a transaction or disposition—is not an element of undue influence.[26] Weakness in mind or body may, however, be one of the circumstances that gives rise to a presumption of undue influence or that tends to show that direct evidence of undue

---

[24] The rule is well-established that a trier of fact is not obliged to believe a witness simply because his testimony
"was not contradicted by another witness.2"

"2 The interest of a witness may always be shown 'for the purpose of drawing in question the credibility of such witness.' MCLA 600.2158; MSA 27A.2158; 5 Callaghan's Michigan Pleading & Practice (2d ed), § 37.205, pp 557–558. *See Goppelt v Burgess,* 132 Mich 28, 30; 92 NW 497 (1902); *Ball-Barnhart-Putman Co v Lane,* 135 Mich 275; 97 NW 727 (1903).
"The issue of credibility is to be resolved by the trier of fact. As stated in *Woodin v Durfee,* 46 Mich 424, 427; 9 NW 457 (1881), '[a] jury may disbelieve the most positive evidence, even when it stands uncontradicted.' "

*People v Jackson, supra,* pp 624–625.

[25] "A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness * * * ." Code of Professional Responsibility and Canons, DR 5-101(B).

[26] *See* 13 Williston, *supra,* § 1625, pp 779, 782.

persuasion was sufficient to overcome the will of the person subjected to it.[27]

In sum, the rebuttal offered—independent advice and Julia's strong will—was unresponsive to the presumptive inference and to the direct evidence of undue influence and abuse of the relationship. There was no pertinent rebuttal.

## V

The judge surmised: "Human vanity is such that she might well have thought she would outlive him and then have a full and free opportunity to do with the property as she saw fit. It is a very safe guess that neither foresaw a situation where their children would be contesting over the property."

Julia should not have been constrained to make the compromise implicit in the judge's surmise. It was abusive of the marital relationship to deny her a disposition of her property which was not dependent on her surviving Merkiel.

It is apparent from Merkiel's statement in his letter to Edward that the conveyance was importuned. Its effect was to change, in the last months of Julia's life, at a time when her health was failing, the disposition of her property reflected in two wills and to disinherit altogether the children for whom she had expressed affection throughout her life.

I am left with the definite and firm conviction that Julia executed the conveyance "to purchase peace",[28] and that there was persuasion abusive of the relationship and hence undue influence.

I would, in accordance with the advisory jury's verdict, reverse and declare the deed cancelled.

---

[27] *Id. See also Seeley v Price, supra; Duncombe v Richards, supra.*

[28] *Witbeck v Witbeck,* 25 Mich 439, 442 (1872). *See also Southwick v Southwick,* 175 Mich 608; 141 NW 624 (1913).