*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARGARET CLARKE,

      Plaintiff-Appellee,

UNPUBLISHED
October 22, 2019

v

LAWRENCE DAVID KORN,

      Defendant-Appellant.

No. 342144/343197
Oakland Circuit Court
LC No. 2016-842365-DO

Before: FORT HOOD, P.J., and SAWYER and SHAPIRO, JJ.

PER CURIAM.

In Docket No. 342144, defendant appeals as of right the trial court's judgment of divorce, particularly with respect to property division. In Docket No. 343197, defendant appeals an award of attorney fees to plaintiff. We reverse the award of attorney fees and remand for the trial court to make a new determination as to their reasonableness, but affirm in all other respects.

## I. FACTUAL BACKGROUND

In March 2005, the parties met and began to see one another socially. Plaintiff was an IT director at Trinity Health with an undergraduate degree in finance and an MBA in management. She and her three children from a previous marriage, then in their mid to late teens and early 20s, lived in a home located in West Bloomfield that she and her husband had purchased in 1988 (the Michigan home). Defendant was a divorced attorney who had stopped practicing in May 2000 after almost 22 years of practice. In November 2000, defendant filed a disability claim that was denied. Defendant claimed he was disabled from the practice of law "because of very poor sleep habits, short term memory issues, and an inability to perform and comprehend legal research." Defendant owned a home in Northville, but following a foreclosure in 2005, was forced to move out and live with his parents.

At some point, defendant moved into the Michigan home, and the parties began discussing the marital benefit of putting defendant on plaintiff's insurance and of filing a joint tax return that would allow plaintiff to use defendant's $1.8 million loss carryforward to reduce her tax liability. The parties married on October 8, 2009. Defendant claims that he was clear

with plaintiff that this was a "friendship marriage," but while plaintiff admits that the parties did not have a physical relationship, she testified that she held out hope that their relationship would evolve.

Beginning in 2009, defendant began contributing substantial assets to the marriage, the first of which was a $300,000 bankruptcy settlement. In January 2011, defendant began receiving $25,600 a month in disability income. He also received roughly $117,000 for five months of disability back pay. Finally, in March 2014, defendant received $667,000 as a settlement for a malpractice claim he filed against the attorneys that represented him on his November 2000 disability claim. In October 2012, plaintiff asked defendant to contribute toward marital expenses, and the parties agreed defendant would give plaintiff $2,000 a month. Plaintiff also charged defendant roughly $500 per month for his portion of their cell phone bill, his truck insurance, and his roughly 40 website domains that plaintiff testified cost approximately $80 a month.

On January 28, 2013, the parties purchased a home in West Palm Beach, Florida for $332,000 (the Florida home). Both of their names were on the deed, but only defendant was on the mortgage. The parties moved belongings to the Florida home and began substantially improving it. Although the money for this work all came from defendant, plaintiff contributed a substantial amount of "sweat equity" by painting, remodeling, ripping out old fixtures, putting in a new fan, pulling out carpet, painting the back porch, pulling down structures and an old rose garden, seeding the yard, and working with people to clean out trees that had never been trimmed. Around this time, defendant purchased a Ski Nautique boat to replace plaintiff's 1995 Tige boat that was destroyed in a windstorm in the fall of 2012. The following year, in 2014, the parties began an extensive remodel of the Florida home that, according to plaintiff's testimony, cost approximately $150,000.

In May 2014, defendant told plaintiff he wanted a divorce. Defendant claimed at trial that he had previously told plaintiff that he intended to divorce her as soon as he began receiving Social Security and Medicare benefits, but plaintiff denied that claim. However, plaintiff testified that she decided not to fight defendant on the divorce and she agreed to work with defendant's therapist to reach an amicable settlement. The parties separated between May 28, 2014 and June 3, 2014, and defendant moved more of his belongings from the Michigan home to the Florida home.

The parties originally discussed having Hyatt Legal, a service provider paid for by plaintiff's employer, file and complete a simple divorce in 60 days with one lawyer and no attorney fees. Plaintiff testified that an uncontested divorce with Hyatt Legal would cost $850, but that she later learned that, because defendant was proposing a side agreement and numerous stipulations, the amount of paperwork necessary for their divorce was beyond Hyatt Legal, so plaintiff hired her own attorney, Joseph Henning. Defendant was apparently unaware of this, and believed Henning was the Hyatt Legal attorney that he represented both parties was acting solely as a scrivener or scribe.

Plaintiff initially filed for divorce on December 2, 2014, but that case was ultimately dismissed for lack of progress. According to plaintiff, the parties did not want to finalize the divorce before December 31, 2014, because otherwise they would not be able to file a joint tax

return for that year. In December 2015, defendant demanded plaintiff stop taking his money and that she separate their banking accounts, contending that he had repeatedly asked plaintiff for a proposed divorce judgment and settlement agreement, but neither were ever provided. Plaintiff gave defendant a proposed settlement in January 2016.

In February 2016, defendant learned that Henning only represented plaintiff. Defendant demanded plaintiff give him $7,000 as a retainer to hire his own attorney, alleging that plaintiff had misled him. After plaintiff refused, defendant filed a civil complaint against plaintiff for fraud, breach of fiduciary duty, accounting, and conversion,[1] and plaintiff filed the instant divorce action. On numerous occasions, the trial court strongly recommended that the parties settle, but they ultimately proceeded to trial. Heavily disputed issues included the nature of the parties' relationship and marriage, plaintiff's control of both parties' finances, defendant's competency and ability to take care of his own finances, defendant's substantial spending and gifting habits, gifts from defendant to plaintiff and her children, and the refinancing of the Florida home. The parties also disagreed about which assets were separate and which were marital, as well as the value of most of the assets.

The trial court "was not impressed with either party as a witness and did not find either party to be credible." It awarded plaintiff the Ski Nautique boat, the Michigan home, her two premarital pensions, and 50% of equity the parties had in the Florida home. The trial court awarded defendant all of the rights to a book that he had been working on that plaintiff had assisted with, the Florida home with his 50% equity share, two dressage horses, and half the value of the marital portion of a Trinity Health 403(b). Each party received workout equipment that was in their respective homes and, with the exception of two paintings and three rugs that belonged to defendant from plaintiff's home, each party received all personal property in their respective homes. Plaintiff was given sole responsibility for a tax lien on the Michigan home, and both parties were individually responsible for any credit card debt in their names.

The trial court also determined that plaintiff did not commit fraud against defendant or unduly influence him, and that there was no basis to award defendant treble damages. The trial court relied on defendant "readily" granting plaintiff access to all the marital funds, plaintiff being "largely responsible for handling the parties' finances during the marriage," and defendant's testimony that "everything we did financially was put in her care, custody, and control."

In light of plaintiff's employment and defendant's "substantial" disability payments, the trial court declined to award either party attorney fees. However, following the trial court's written opinion making factual determinations, defendant filed a motion to clarify, which the trial court denied as a mislabeled motion for reconsideration that failed to show palpable error. The trial court issued the Judgment of Divorce on September 20, 2017, and defendant then filed a motion for relief from judgment. The trial court denied defendant's motion and granted

---

[1] Defendant's civil case was ultimately dismissed on the basis that the issues raised by defendant could be resolved within this divorce action.

plaintiff $3,000 in attorney fees in light of defendant's "unreasonable conduct and baseless attempts to relitigate issues decided at trial."

In Docket No. 342144, defendant appeals the trial court's determination that plaintiff did not commit fraud or conversion, as well as its property division decisions. In Docket No. 343197, defendant appeals the trial court's assessment of $3,000 in attorney fees.

## II. DOCKET NO. 342144[2]

### A. JUDICIAL MISCONDUCT

Defendant first contends that the trial court was not impartial and made inappropriate predeterminations of fact that prejudiced the ultimate disposition of the trial and denied him a fair trial. We disagree.

This Court reviews de novo questions of law on appeal. *Kern v Blethen-Coluni*, 240 Mich App 333, 341-342; 612 NW2d 838 (2000). However, a trial court's findings of fact when granting a divorce judgment will not be reversed unless they were clearly erroneous. *Reed v Reed*, 265 Mich App 131, 150; 693 NW2d 825 (2005). Factual findings are clearly erroneous if this Court is left with a firm and definite conviction that a mistake has been made. *Id.* "If this Court upholds the trial court's findings of fact, it must then decide whether the dispositional ruling was fair and equitable in light of those facts." *Id.* A trial court's dispositional ruling is discretionary, and this Court will affirm the ruling unless it "is left with the firm conviction that it was inequitable." *Id.*

Defendant alleges that the trial court prejudged both defendant and material issues to the case. Although defendant cites multiple statements by the trial court that he contends evidence its bias and hostility against him, a careful review of the record reveals that defendant has taken multiple statements out of context in an attempt to project bias onto the trial court where none actually exists. For example, defendant complains about two statements made by the trial court at a pretrial hearing on plaintiff's motion for an independent medical examination (IME).[3]

In the first statement, the trial court made several references to "marital money" and then stated, "just off the top, when they're married, isn't she entitled to 100 percent of it if—I mean, it's marital money . . . . Even if they are keeping it separate." Defendant argues that even though the trial court admitted it only had the complaint, motions, and counsels' arguments before it at the pretrial hearing, the court nonetheless made the erroneous factual determination that all of the money at issue was marital money to which plaintiff was entitled. This misrepresents the record. The full exchange was as follows:

---

[2] Although defendant listed nine issues in his brief, he only raised four arguments. Accordingly, we have only addressed the arguments actually made on appeal.

[3] Plaintiff alleged that there were questions as to defendant's competency and ability to proceed in the case without someone to act on his behalf, and sought an order compelling defendant to submit to an IME based upon that fact.

> *Defense Counsel*: And [defendant's] position is that he let [plaintiff] handle all his money and that she helped herself to a good amount of that money.
>
> *Plaintiff*: That's—
>
> *The Court*: Doesn't she get to hand—take all—
>
> *Plaintiff*: Exactly. Eight percent.
>
> *The Court*: I mean, isn't—I'm just—I know you're not trying it now. But I'm just trying to help you settle.
>
> *Plaintiff's Counsel*: Understood.
>
> *The Court*: But just off the top, when they're married, isn't she entitled to 100 percent of it if—I mean, it's marital money.
>
> *Defense Counsel*: If they weren't keeping all of their finances separate—
>
> *The Court*: Even if they are keeping it separate—

Throughout this exchange, in no way did the trial court make a determination regarding marital funds; rather, the court was suggesting to defendant that defendant review how the law treats marital funds before proceeding to trial on what was appearing to be legally unfounded claims of fraud and conversion.

The second statement by the trial court that defendant relies upon came immediately after the court denied plaintiff's motion for an IME:

> Obviously, I am denying [plaintiff's] motion today. But [defendant] may very well have lost the entire war. And if [plaintiff] is able to convince me otherwise, he's going to be very sorry that he didn't settle with her. And then what if the Court of Appeals agrees with me and thinks this is a scam and order[s] him to pay all of her attorney fees and then some?

In this statement, the trial court was again encouraging defendant to settle. The court instructed defendant's counsel to relay to defendant, who was not present for the hearing, that although he won the battle—in that plaintiff's motion for an IME was denied—he may have lost the war—in that his competency could reflect a level of comprehension inconsistent with his assertions that plaintiff fraudulently took advantage of him. Moreover, the trial court's statement regarding this Court agreeing that the case was "a scam" was neither a threat nor evidence that the trial court had decided that defendant was defrauding the court. Read in context, the trial court was posing several hypotheticals to drive home the point that it was in defendant's best interest to settle. The court was noting that settling would likely be favorable for defendant because, if it was established that defendant was competent and that plaintiff did not take advantage of him, the ultimate judgment could be significantly unfavorable. And, as it had been previously noted at the hearing that defendant would likely appeal any unfavorable judgment and raise the issue of his competency, the court further relayed the possibility that this Court could agree with the

underlying judgment and make defendant's situation worse by ordering costs and fees. In summation, this statement was not a threat; it was a suggestion designed to encourage defendant to thoughtfully consider whether proceeding to trial was in his best interests.[4]

Defendant next contends that the trial court's hostility and antagonism toward him was also evidenced in its January 10, 2018 Clarification Order, wherein the court stated that defendant was "competent and his attempts to manipulate the court [had] not gone unnoticed." Contrary to the pretrial statements, this statement does suggest, at the very least, irritation with defendant on the part of the trial court. However, as a finding of fact, the statement was adequately supported by the record.

Defendant correctly points out that the evidence of his disability was unrefuted and there was no evidence that he was faking. Defendant is also correct that his claims of disability were not equivalent to claiming incompetency. A party can be both competent enough not to need a guardian or conservator, but incapable of handing their own finances. See, *In re Estate of Lewis*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 343765), slip op at 2 (plaintiff was mentally competent but nevertheless needed assistance with his financial affairs). The problem for defendant is that, although he established both legal competency and disability, the record only definitively established that his disability prevented him from practicing law, not that it prevented him from handling his finances. Most notably, at the time of trial, defendant had been handling his finances on his own since February 2016, and he testified multiple times that he had gone three to four months without penalties, overdraft fees, or late payments on any of his bills. Defendant's own testimony directly undercut his argument that he was incapable of handling his finances. Defendant at once established that he was capable of handling his finances, but at the same time, his claims against plaintiff were largely premised on the idea that he was actually not so capable. It was not erroneous for the court to point out this inconsistency.

Defendant further asserts that the trial court falsely claimed he was manipulating the court by writing in its Clarification Opinion "that Appellant's claims that he is elderly, disabled, and taken advantage of have been 'disproven.' " Again, this is not an accurate interpretation of the trial court's words. The trial court actually wrote:

Defendant again begins his Motion for Relief from Judgment by arguing that he is elderly and disabled and that Plaintiff has taken advantage of him. This claim has been disproven and the court will not revisit it. In the same vein, Defendant continually argues that Plaintiff has manipulated him . . . .

---

[4] It is also worth noting that the trial court posed similar hypotheticals to plaintiff, which is a fact defendant seems to have deliberately ignored on appeal. Moreover, in making these hypotheticals, the trial court was explicit that it did not "know what [it was] going to do," (i.e., that it had not prejudged the case) and it was at all times clear that whether the parties proceeded to trial was their own choice.

Contrary to the assertion in defendant's brief, the trial court never stated that defendant's age or disability had been "disproven." It would appear that the trial court used the term "This claim," in reference to the claim that plaintiff had taken advantage of defendant. Thus, there is no merit to the argument that the trial court ignored defendant's disability. And, again, we note that defendant only actually established that he was disabled from practicing law, not that he was incapable of controlling his finances.

Defendant next asserts that the trial court evidenced its bias against him by advising him that it could craft an "appeal-proof" opinion. Defendant contends that, in making the statement, the trial court "implied that[,] no matter what the evidence, if [defendant did] not settle, the court [would] ensure the threatened outcome." Again, defendant misrepresents the record by selecting three sentences out of context. From the very beginning of the pretrial hearing, the trial court began posing to the parties hypothetical outcomes in an effort to convince the parties that it would be in their best interests to try and come to an agreement and settle. The trial court was clearly trying to make the point that compromise would be a better solution than trial; that it would be faster, less costly, and less risky given that they had no idea how the trial court would ultimately resolve the issues. There is nothing in the record that suggests that the trial court was threatening defendant, nor does the statement read in context suggest that the trial court had prejudged the issues.

Finally, defendant briefly suggests that the trial court only found that defendant lacked credibility in reliance on the fact that appellate courts defer to a trial court's resolution of factual issues, particularly those involving witness credibility, to prevent any reversal. Defendant contends that because of this alleged plot, the trial court is not entitled to any deference for its opinion, findings, rulings, or orders. The record does not support this accusation, and moreover, we note that the case cited by defendant for the idea that we must disregard the trial court's credibility determination, *People v Thenghkam*, 240 Mich App 29, 47; 610 NW2d 571 (2000), abrogated on other grounds by *People v Petty*, 469 Mich 108, 116; 665 NW2d 443 (2003), does not support that contention. *Thenghkam* merely stands for the proposition that a reviewing court may not "tacitly endorse obvious errors" in a trial court's factual findings "under the guise of deference." We see no such obvious errors in this case. The record is clear that this was a contentious case, that the parties harbored significant frustration with one another, and that they often contradicted themselves and one another in testifying to their version of the events. That the trial court thus questioned the credibility of both plaintiff and defendant is not evidence of the type of egregious judicial conduct defendant alleges.

Read in context, the statements relied upon by defendant do not evidence that the trial court made any predeterminations, showed bias or prejudice against defendant, ignored unrebutted evidence in the record, or otherwise disparaged defendant without a proper basis. Defendant has not shown a violation of due process. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

## B. UNDUE INFLUENCE, FRAUD, AND MISREPRESENTATION

Defendant next argues that the trial court erred when it found no undue influence, no fraud, and no conversion on the part of plaintiff. We disagree.

First, with respect to undue influence, which may only occur when a fiduciary relationship exists, defendant is correct that a fiduciary relationship may exist between spouses. *Kar v Hogan*, 399 Mich 529; 251 NW2d 77 (1976); *Nederlander v Nederlander*, 205 Mich App 123; 517 NW2d 768 (1994). However, "marriage is not a relationship that has traditionally been recognized as involving fiduciary duties." *In re Karmey Estate*, 468 Mich 68, 75; 658 NW2d 796 (2003). "The influence of a husband or a wife over that person's spouse could be great—at times almost overwhelming—without being 'undue.' " *Id.* As a result, Michigan law precludes application of the presumption of undue influence to marriage. *Id.*

> "To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's inclination and free will. Motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, is not sufficient." [*Id.*, quoting *Kar v Hogan*, 399 Mich 529, 537; 251 NW2d 77 (1976).]

Defendant asserts that a fiduciary relationship existed because of his disability. Although defendant was never appointed a conservator and there is no evidence that he executed a power of attorney, defendant claims that he "vest[ed] authority in" plaintiff because his disability "resulted in his difficulty in keeping track of financial transactions and his inability to balance books, write checks[,] and keep financial records."

We need not determine whether a fiduciary relationship actually existed because, even assuming arguendo that it did, defendant failed to establish any facts evidencing undue influence. He never testified that plaintiff threatened him. In fact, he testified that when plaintiff did not spend money in accord with his wishes, he threatened to end the marriage. Likewise, there is no evidence of physical or moral coercion, or undue flattery. Thus, the only way for defendant to show undue influence would be to present evidence that plaintiff engaged in fraud or misrepresentation. *Karmey*, 468 Mich at 75. The record does not support a finding that either occurred.

Defendant testified that if plaintiff had not spent their money the way he wanted, he would have taken over his accounts,[5] and he twice testified that, at the time of trial, he was

---

[5] It is notable that the money in the joint bank account constituted marital funds, and defendant has provided no legal support for the contention that, as a joint owner of a bank account containing marital funds, plaintiff was not permitted to spend those funds as she saw fit. Had the parties not been married, a different result might follow, and perhaps defendant's claim of conversion would have merit. However, because the funds in this account were marital funds, the parties both had a 100% ownership interest in the funds. Furthermore, plaintiff testified that she wrote the checks defendant told her to write and did not spend any money without his permission. If the trial court credited plaintiff's testimony, she had defendant's permission to spend the money as she did. Notwithstanding, as stated above, even if she did not have defendant's permission, plaintiff was spending funds she owned by right of marriage.

responsible for his accounts and had been paying on time without late payments for over four months.[6] Thus, the record established that, despite defendant's disability, he *was* capable of balancing books, writing checks, and keeping financial records. That defendant turned all of those activities over to plaintiff both while they lived together and after they were married did not establish either that he could not perform them on his own or that he was unable to understand how the money was being spent. Indeed, defendant often spontaneously shouted out financial information while plaintiff was testifying, suggesting his memory for financial matters is far greater than he asserts.

That defendant had trust and confidence in plaintiff paying the bills and handling the finances would be consistent with a marriage where one spouse handles the finances. Likewise, defendant's failure to "actively monitor" plaintiff's handling of the finances because he trusted her would be consistent with many marriages. Neither is evidence of fraud or misrepresentation, and one spouse handling all of the financial matters is not indicative of the other spouse's ability or lack of ability to handle such matters. Furthermore, defendant testified that he began to question plaintiff's handling of his money when he ran out of it after a short period of time. However, given how often and for how long that occurred, this allegation is at odds with defendant's assertion that he had full faith and trust in plaintiff, and what is more, defendant then inconsistently testified that he had not scrutinized his financial transactions until before plaintiff refused to pay his attorney's retainer in February 2016.

Moreover, even assuming arguendo that fraud or misrepresentation occurred, defendant must show that the improper act by plaintiff was significant enough to have overpowered defendant's volition, destroyed his free agency, or impelled him to act against his own inclination and free will, *Karmey*, 468 Mich at 75, and this record, including defendant's own testimony, does not support such a conclusion. Defendant suggests that plaintiff somehow took advantage of him by convincing him to pay off their boat loan; however, defendant testified that he asked plaintiff how to fix his credit and she suggested paying off the boat loan, so he paid off the boat loan. There is no evidence regarding what, if any, impact paying the boat off had on his credit, so there is no way to determine the accuracy of plaintiff's alleged statement. However, her suggestion was not outrageous. Furthermore, defendant admits that *he* made the decision and *he* paid off the boat loan. Thus, plaintiff's advice cannot be characterized as a fraud or misrepresentation that caused defendant to pay off the boat against his will.

Defendant also complains that plaintiff was in charge of refinancing the Florida home and did not obtain the financing defendant requested. Plaintiff testified that she lowered

---

[6] Defendant testified that the only time plaintiff knowingly and voluntarily took money from their joint account for her own benefit was when she took money for her daughter's car. In other words, defendant admitted that he knew about or authorized every other charge, payment, and purchase . And, with respect to the car payments, plaintiff testified that defendant knew the terms of the car loan because he was there and traded in his vehicle toward the purchase. Thus, there was evidence to support the conclusion that he had full knowledge of the car purchase and amount of payments.

defendant's payments and got rid of his private mortgage insurance payment, however, defendant claims that plaintiff defrauded him because she did not get him the best loan possible. As evidence of this claim, defendant testified that he could have obtained a home equity line of credit from a local credit union for only .5% more and, even without a formal appraisal, he could have secured the $60,000 in hand he wanted, but that he only found this out after closing. If defendant sought out and found a refinancing opportunity that was better than the one plaintiff got for him, he proved he was more than capable of making his own financial decisions and reviewing loan documents, in which case any actions plaintiff took toward the refinancing did not overpower his will or force him to accept her actions.

The record simply does not support a finding that plaintiff exerted undue influence over defendant, that she behaved fraudulently, or that she misrepresented financial information to defendant. Because the evidence adequately supports the trial court's findings of fact, they were not clearly erroneous.

## C. PROPERTY DIVISION

Finally, defendant takes issue with multiple aspects of the trial court's property division. Property distribution in a divorce is controlled by statute. *Reed*, 265 Mich App at 151. After granting a divorce, " 'the court may make a further judgment for restoring to either party the whole, or such parts as it shall deem just and reasonable, of the real and personal estate that have come to either party by reason of the marriage, or for awarding to either party the value thereof . . . in money.' " *Id.* at 151-152, quoting MCL 552.19. "The trial court's first consideration when dividing property in divorce proceedings is the determination of marital and separate assets." *Reed*, 265 Mich App at 150 (quotation marks and citation omitted).

> The categorization of property as marital or separate . . . is not always easily achieved. While income earned by one spouse during the duration of the marriage is generally presumed to be marital property, there are occasions when property earned or acquired during the marriage may be deemed separate property. . . . [P]roceeds received by one spouse in a personal injury lawsuit meant to compensate for pain and suffering, as opposed to lost wages, are generally considered separate property. Moreover, separate assets may lose their character as separate property and transform into marital property if they are commingled with marital assets and treated by the parties as marital property. The mere fact that property may be held jointly or individually is not necessarily dispositive of whether the property is classified as separate or marital. [*Cunningham v Cunningham*, 289 Mich App 195, 201-202; 795 NW2d 826 (2010).]

Generally, assets earned during the marriage are properly considered part of the marital estate and subject to equitable division. *Reed*, 265 Mich App at 152. Separate assets, however, may not be invaded unless one of two statutory exceptions is satisfied. *Id.* MCL 552.23(1) permits the invasion of a spouse's separate assets if, after the marital assets are divided, "the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party . . . ." MCL 552.401 permits the invasion of separate assets if the other spouse "contributed to the acquisition, improvement, or accumulation of the property." A

court's goal when apportioning a marital estate is an equitable division in light of all the circumstances. *Reed*, 265 Mich App at 152. Although mathematical equality is not required, the trial court must explain any clear deviation from congruence. *Id.*

First, defendant argues that the trial court failed to address all of the "required" property division factors in *Sparks v Sparks*, 440 Mich 141, 158; 485 NW2d 893 (1992). However, defendant acknowledges that *Sparks* only requires findings "under the relevant factors." Indeed, some factors will be irrelevant in many cases, and courts are not required to give the factors equal weight. *Id.* Defendant has failed to explain which *Sparks* factors were relevant that the trial court left unaddressed, or how such factors would have impacted the result. An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims. *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 633; 752 NW2d 479 (2008). Accordingly, defendant has failed to show any error with respect to the *Sparks*.

Defendant also contends that the trial court erred because it did not find his monthly disability payments, malpractice settlement, and the Florida home to be his separate property. This argument lacks merit. Regarding defendant's monthly disability income, he contends it should have been considered separate property because his disability claim originated from a premarital disability in 2000, and the amount of the payments was based on his income in 2000. However, disability benefits, workers compensation, or an award from a personal injury lawsuit all constitute marital property if they represent wages that would have been earned during the marriage. See *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). Because the parties were already married when defendant began receiving his monthly disability benefits, and because those benefits were intended to replace wages lost during the marriage because of his disability, the trial court correctly considered them marital property.

Defendant is correct that his malpractice settlement and lump sum disability payment were originally his separate property because they compensated him for wages lost *before* the marriage. *Id.* at 207. However, as defendant failed to take steps to maintain the funds as his individual property, they were converted to marital property. *Id.* In *Cunningham*, the defendant's individual money was deposited into a joint account "in which both parties regularly deposited funds from their own earnings," and the money was used to purchase a marital home. *Id.* at 207. When the parties eventually divorced, this Court determined that the money had been converted into marital property after it was deposited in the joint account and used to purchase the house. *Id.* at 207-208. Here, the trial court appears to have decided that, because defendant deposited the funds into the parties' joint bank account—which plaintiff could and did access to pay both parties' bills—the money became marital property. Given the manner in which the funds tended to be used ultimately used we agree.

Defendant did not clearly recall how the $300,000 bankruptcy settlement was spent, so there is no way to determine what, if anything, should have been considered separate property. Regarding defendant's $117,000 lump sum disability payment, the testimony established that he spent $23,000 on a horse for a friend, $28,000 on a car for plaintiff's son, and $62,000 on the dressage horses, totaling $113,000. To the extent the horses should have been considered separate property, defendant was awarded the horses, so there was no error. Moreover, the other items are not the property of either party—they were gifts to third parties—so it is irrelevant whether they were purchased with separate or marital funds.

Regarding the malpractice settlement, defendant testified that, with the exception of plaintiff's recommendation to pay off the boat, she did not attempt to tell him how to spend any of it. And, with respect to the boat, although defendant contends that plaintiff received the boat without having paid anything toward it out of her assets, the purchase contract revealed a trade-in of some type. When the trial court inquired about what was used for the trade-in, plaintiff testified her trailer had been used. Thus, there was evidence that plaintiff did contribute to the purchase of the boat, and thus, it was not erroneous for the court to consider it marital property. Finally, with respect to the Florida home, it was purchased during the marriage, plaintiff's name was on the title, and plaintiff stayed there when she went to Florida. Furthermore, plaintiff testified that she put a great deal of sweat equity into the Florida home, and defendant acknowledged that plaintiff had done everything she said she did in that regard. Thus, even assuming that the Florida home constituted a separate asset because only defendant's money was used to purchase it, MCL 552.401 permitted the trial court to "invade" that asset and award plaintiff an interest in it because she significantly contributed to its improvement.

Finally, defendant argues that the trial court erred because it determined that various items of personal property he had owned before the marriage were marital property and, with the exception of two paintings and three rugs, awarded the property to plaintiff. Defendant argues that he should be awarded his exercise equipment and rugs, or be compensated for them. With respect to the rugs, there is insufficient evidence about the value or ownership of any rugs other than three valuable ones that the trial court awarded to defendant. Accordingly, the trial court did not err in this regard. With respect to three pieces of exercise equipment, the record indicates that, in postjudgment proceedings, plaintiff conceded that defendant owned these before the marriage and agreed to return them to him, and the trial court memorialized that agreement in its order on plaintiff's motion to enforce the judgment by referencing the agreement set forth in the transcript. Accordingly, defendant's claim to exercise equipment is now moot.

In summation, other than its original determination concerning the exercise equipment, which has been remedied, we discern no errors in the trial court's determinations of what constituted marital property and what did not.

Defendant next argues that the trial court erred because the divorce judgment made each party responsible for their own credit card debt, but that ruling conflicted with the underlying opinion in which the trial court set forth its factual findings. This argument lacks merit. Defendant is correct that the only debt addressed in the trial court's opinion was the tax lien on the Michigan home. However, that appears to have been the only nonmortgage debt in both parties' names. There was no evidence that any outstanding credit card debt was in both of their names. Indeed, it appeared their credit cards were completely separate. Therefore, the fact that the trial court explicitly provided in the judgment that each party would be responsible for their separate credit card debt was not erroneous because that was implicit in its opinion determining that the only joint debt was the tax lien. We also note that defendant has provided no legal support for his position on this issue. Accordingly, defendant has failed to establish any error.

Finally, defendant argues that the trial court treated the Michigan home and the Florida home disparately. We disagree. The mere fact that plaintiff received a monetary award as her share of the equity of the Florida home, even though defendant did not receive any money for his interest in the Michigan home, is not evidence of disparate treatment. In fact, the trial court

treated the two residences exactly the same. The Michigan home was valued at $365,000. Once the $421,920 mortgage and $97,633 home equity line of credit debt was considered, there was no equity to divide, so defendant did not receive any value for his interest. The trial court also provided that plaintiff would be solely responsible for the $10,408 tax lien on the Michigan home. Similarly, the trial court determined that the Florida home was worth $435,000. Once the $295,000 mortgage debt was considered, there was $140,000 in equity, which the trial court divided evenly between the parties. The trial court implicitly made defendant solely responsible for his outstanding credit card debt, which he attributed to work on the Florida home. Thus, the trial court valued both properties; reduced the values by the amount of outstanding debt; split the equity, if any, equally between the parties; and ordered that any outstanding debts related to the properties would be the sole obligation of the party who received the property to which the debt was attributable. Defendant has failed to show any disparate treatment occurred.

## II. DOCKET NO. 343197

In Docket No. 343197, defendant argues that the trial court erred by awarding plaintiff $3,000 in attorney fees, maintaining that the court failed to specify his unreasonable conduct and failed to provide any legal or factual support for the award. Defendant also contends that the trial court erred by failing to address either MCR 2.306(D)(2)(a) or (b).[7] We disagree that the trial court erred in finding that attorney fees were appropriate, but we note that the court's determination as to the reasonableness of the fees was not based on adequate documentary evidence, and remand for a redetermination as to that issue.

This Court reviews for an abuse of discretion a trial court's decision to grant or deny attorney fees. *Reed*, 265 Mich App at 164. An abuse of discretion occurs when a trial court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Berger v Berger*, 277 Mich App 700, 723; 747 NW2d 336 (2008). This Court reviews de novo any questions of law, but reviews for clear error the findings of fact on which the trial court based its decision. *Id.* Absent a statute, court rule, common-law exception, or contract expressly allowing them, attorney fees "are not recoverable as an element of costs or damages." *Reed*, 265 Mich App at 164. Although attorney fees in domestic cases are authorized both by statute, MCL 552.13, and court rule, MCR 3.206(D), they are not recoverable as of right in divorce cases. *Id.* However, in a divorce action, attorney fees "are also authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation." *Cassidy v Cassidy*, 318 Mich App 463, 480; 899 NW2d 65 (2017) (quotation marks and citation omitted).

Here, the trial court expressly cited defendant's "unreasonable conduct and baseless attempts to relitigate issues decided at trial" as the basis for its award. Accordingly, the trial court cited a proper legal basis on which to award the attorney fees. As for a factual basis

---

[7] Defendant refers to MCR 2.306(C)(2)(a) and (b) in his brief on appeal, however, we note that this appears to have been a typographical error. There are no subsections (a) or (b) in MCR 2.306(C)(2), and that particular section is not relevant to defendant's argument.

-13-

supporting the award, attorney fees were awarded against defendant after the trial court made its factual determinations and defendant proceeded to file multiple motions reiterating arguments that defendant had already made and that had already been rejected. To the extent that defendant wanted the trial court to reconsider its legal and factual determinations, he failed to cite to evidence in the record supporting his indirect argument that the trial court's findings were clearly erroneous, or point out any errors of law he believed the trial court had made. Defendants posttrial conduct required plaintiff to file no less than two responsive pleadings and one motion, and required her to attend two hearings. Thus, given the lack of merit to defendant's motions as well as their repetitive nature, we cannot conclude that the trial court abused its discretion by determining that fees were appropriate.

However, as defendant further contends that plaintiff failed to provide any invoice, detailed billing statement, or other documentation in support of her counsel's hourly rate or any other requirements necessary to show reasonableness. Defendant failed to preserve this argument below, and accordingly, we review for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). To affect substantial rights, the error must be prejudicial, meaning it affected the proceeding's outcome. *Id*. at 763.

"The party requesting attorney fees bears the burden of proving that they were incurred and that they are reasonable." *Sabbagh v Hamilton Psychological Servs*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 342150), slip op at 16, citing *Reed*, 265 Mich App at 165-166. The party requesting fees "must submit detailed records, which the court must examine and opposing parties may contest for reasonableness." *Smith v Khouri*, 481 Mich 519, 532; 751 NW2d 472 (2008). "The fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.*

Here, plaintiff supported the motion with testimony to establish the attorney's rate, the services actually rendered, and the amount of fees plaintiff incurred. Plaintiff failed to provide any detailed billing statement or invoice to supplement the testimony, and we conclude that determining the reasonableness of the fees without such evidence plainly violated established Michigan law and constituted plain error. See *id*. at 532. Moreover, the court's error was prejudicial because, without a proper determination as to reasonableness, the underlying award of fees was improper. See *Reed*, 265 Mich App at 165-166 (explaining that the party seeking attorney fees must prove that the fees were incurred *and* reasonable). Accordingly, while the trial court did not err in determining that fees were warranted, it did plainly err in finding that the fees were reasonable without the appropriate documentary evidence.

IV. CONCLUSION

In Docket No. 342144, the trial court's actions were not indicative of hostility, bias, or predetermination of the facts, and defendant has not shown that the trial court committed any errors of law or that any of its relevant findings of fact were clearly erroneous. In Docket No. 343197, the trial court's determination that the requested attorney fees were reasonable was based on insufficient evidence. Defendant is entitled to view detailed records to ensure that the requested fees are reasonable.

Affirmed in all respects other than the award of attorney fees. The award of fees is reversed and that matter is remanded for the trial court to make a reasonableness determination based on appropriate, detailed evidence. We do not retain jurisdiction.

/s/ Karen M. Fort Hood
/s/ David H. Sawyer
/s/ Douglas B. Shapiro